# EXHIBIT A

1    Stephen Montoya (#011791)
2    **Montoya, Jimenez, Lucero & Pastor, P.A.**
     3200 North Central Avenue, Suite 2550
3    Phoenix, Arizona 85012
     602-256-6718 (telephone)
4    602-256-6667 (fax)
     stephen@montoyalawgroup.com
5
6    ~~Richard Trujillo (#002730)~~
     ~~**Rader, Sheldon & Stoutner, PLLC**~~
7    ~~11260 North Tatum Boulevard, Suite 143D~~
     ~~Phoenix, Arizona 85028~~
8    ~~480-636-1888 (telephone)~~
     ~~480-393-8888 (fax)~~
9    ~~vega@raderlucero.com~~

10   Attorneys for Plaintiffs

11
                 **IN THE UNITED STATES DISTRICT COURT**
12
13               **FOR THE DISTRICT OF ARIZONA**

14
     Austin Flake and Logan Flake,
15
          Plaintiffs,
16
     v.                                        No. CV 15-01132-PHX-NVW
17
     Joseph Arpaio, in his personal and
18   official capacities, Ava J. Arpaio, in her    ~~**SECOND**~~ **PROPOSED THIRD**
     personal capacity as the spouse of Joseph     **AMENDED COMPLAINT**
19   Arpaio, Marie Trombi, in her personal
     capacity, ~~John Doe Trombi, in his~~         (Jury trial demanded)
20   ~~personal capacity as the spouse of Marie~~
     ~~Trombi,~~ and Maricopa County, Arizona,
21   a political subdivision of the State of
     Arizona,
22
          Defendants.
23

24        For their ~~Second~~ Third Amended Complaint against Defendants, Plaintiffs

25   allege the following:

26   1.   This is a civil action seeking to redress the violation of the rights of Austin

27        Flake and Logan Flake under the First, Fourth, and Fourteenth Amendments to

28        the Constitution of the United States and the common law of Arizona.

2.    Plaintiffs assert their federal claims against Defendants under the Civil Rights Act of 1871, 42 U.S.C. § 1983, and the doctrine of supplemental jurisdiction under 28 U.S.C. § 1367 as to Plaintiffs' state law claims.

### General Allegations

3.    Austin Flake is an adult male residing in Maricopa County, Arizona.

4.    Logan Flake is an adult woman residing in Maricopa County, Arizona.

5.    Defendant Joseph Arpaio is the Sheriff of Maricopa County, Arizona.

6.    Defendant Ava Arpaio is Joseph Arpaio's spouse.

7.    Sheriff Arpaio was acting for the benefit of his marital community with Ava Arpaio at all times material to this Complaint.

8.    Defendant Marie Trombi is a law enforcement officer who was employed by the Maricopa County Sheriff's Office as a detective at all times material to this Complaint.

9.    ~~Defendant John Doe Trombi is Marie Trombi's spouse.~~

~~10.~~9.   ~~Marie Trombi was acting for the benefit of her marital community with John Doe Trombi at all times material to this Complaint.~~

~~11.~~10. Marie Trombi was acting under color of state law and within the scope of her employment with the Maricopa County Sheriff's Office at all times material to this Complaint.

~~12.~~11. Defendant Maricopa County, Arizona is a political subdivision of the state of Arizona.

~~13.~~12. The Maricopa County Sheriff's Office ("MCSO") is owned and operated by Maricopa County, Arizona.

~~14.~~13. In his capacity as Sheriff of Maricopa County, Sheriff Arpaio is the final decision-maker regarding matters of law-enforcement in Maricopa County, Arizona.

~~15.~~14. Sheriff Arpaio was acting under of color of state law and within the course and scope of his office as Maricopa County Sheriff at all times material to this Complaint.

-2-

1  16.15. In June of 2014, Austin and Logan Flake were a young married couple from the
2       East Valley of Maricopa County, Arizona living in Provo, Utah, where Austin
3       was a student at Brigham Young University.
4  17.16. Austin was 21 years-old, and Logan was 20 years-old.
5  18.17. Austin is the son of United States Senator Jeff Flake of Arizona.
6  19.18. In late June of 2014, Plaintiffs were back in Gilbert, Arizona house-sitting for
7       Logan's parents, Jesse and MaLeisa Hughes, who were out-of-state on a short
8       vacation.
9  20.19. Austin and Logan were responsible for taking care of Logan's siblings, as well
10       as tending to the dog kennel that Logan's parents operated out of their home.
11  21.20. The kennel at times boarded approximately 20 15 to 30 dogs for short stays.
12  22.21. In the early morning hours of Friday, June 20, 2014, the air conditioning system
13       that cooled the kennel unexpectedly malfunctioned and stopped working.
14  23.22. Because the air conditioning system unexpectedly failed, the temperature in the
15       kennel increased substantially overnight and this ultimately resulted in the tragic
16       deaths from heat stroke of twenty-one dogs housed in the kennel for the night—
17       including Logan's own family pet, "Patrick."—," who slept in the kennel with
       the rest of the pets.
18  24.23. When Austin and Logan discovered the dogs at approximately 5:30 a.m. on
19       June 20, 2014, the pets were nearly all already dead or dying from what
20       appeared to be heat stroke.
21  25.24. Although Austin and Logan tried to cool the pets down with water and ice, their
22       efforts were unavailing.
23  26.25. On the very next day, June 21, 2014, deputies from the Maricopa County
24       Sheriff's Office responded to calls about the deaths of the dogs at the kennel.
25  27.26. The owner of the kennel and the home, Logan's step-father Jesse Hughes, told
26       the deputies that the dogs had died during the night because the air conditioning
27       system in the kennel had unexpectedly failed.  He also speculated that the
28       system might have failed because an electrical wire in the room may have been

1    chewed-through by a dog.

2    ~~28.~~27. Austin accurately told the deputies that when he checked on the dogs before
3    going to bed at around 11:00 p.m. on Thursday, June 19, 2014, the kennel was
4    cool and the air conditioning system was working, but that when he went back
5    to check on the dogs early the next morning (Friday, June 20, 2014) at around
6    5:30 a.m., the room was more than 100 degrees and the air conditioning system
7    was not working.

8    ~~29.~~28. Neither Austin nor Logan had any reason to either believe that the air
9    conditioning system cooling the kennel was in ill repair or to anticipate that it
10   would fail.

11   ~~30.~~29. As indicated above, Austin and Logan did not live in the Hughes' home and
12   were only there for the week to care for the children and dogs while the Hughes
13   were away on vacation.

14   30.    Austin and Logan had arrived at the Hughes' home on approximately
15   ~~Friday~~Saturday, June ~~13~~14, 2014, and the air conditioning system in the kennel
16   had worked fine all week (six days) without any incident until it unexpectedly
17   failed in the early hours of June 20, 2014.

18   31.    The Hughes home had two air conditioning systems, one of which cooled the
19   kennel (among other rooms) and another air conditioning system that cooled the
20   part of the home where the Flakes slept.

21   ~~31.~~32. Consequently, the Flakes did not realize the air conditioning system cooling the
22   kennel had failed until Austin went into the kennel at approximately 5:30 a.m.
23   on June 20, 2014.

24   ~~32.~~33. Accordingly, on June 22, 2014, a Maricopa County Sheriff's Deputy accurately
25   admitted that the death of the pets was a "tragic accident . . . ."

26   ~~33.~~34. However, only a day later, on June 23, 2014, Sheriff Arpaio issued a press
27   release regarding the death of the twenty-one dogs at the Hughes' kennel (a)
28   proclaiming himself "aggressive" on "animal abuse and neglect," (b) promising
     a "full investigation" in which "no stone will go unturned," (c) falsely claiming

1       that information "given by the owners and caretakers [was] highly suspect," and

2       (d) identifying Logan and Austin Flake by name as the wrongdoers.

3 34.35. A true and correct copy of Sheriff Arpaio's press release of June 23, 2014 is

4       attached hereto as Exhibit 1.

5 35.36. When considered as a whole, Sheriff Arpaio's press release falsely stated or

6       implied by innuendo that Austin and Logan had recklessly, knowingly, or

7       intentionally caused the deaths of twenty-one dogs and then tried to cover it up

8       by lying about it.

9 36.37. Sheriff Arpaio's press release brought Austin and Logan into public disrepute,

10       contempt, and ridicule and also invaded their personal privacy.

11 37.38. Sheriff Arpaio was eager to publicly accuse the Flakes of criminal conduct in

12       order to embarrass Senator Jeff Flake, Austin Flake's father, who had been

13       critical of Sheriff Arpaio's conduct in office.

14 38.39. For example, Senator Flake had publicly criticized the so-called "birther"

15       movement, of which Sheriff Arpaio was a vocal proponent, having conducted a

16       lengthy investigation of the birthplace of President Barack Obama, which

17       culminated in a public announcement that "[p]robable cause exist[ed]" to accuse

18       the President of forgery and fraud.

19 39.40. Sheriff Arpaio had also publicly announced that he was contemplating a

20       political campaign against Senator Flake to secure the Senator's seat in the

      United States Senate.

21 40.41. Sheriff Arpaio has a long history of investigating and maliciously and falsely

22       charging his perceived political enemies with criminal conduct and has cost the

23       taxpayers of Maricopa County literally millions of dollars by asserting bogus

24       charges against his perceived political enemies.

25 41.42. In accordance with Sheriff Arpaio's political malicious, political motivations,

26       the MCSO actually attempted to connect Senator Jeff Flake with the tragic

27       death of the dogs.

28

42.43. For example, on approximately June 27, 2014, MCSO Deputy Chief David Trombi examined Austin and Logan's telephone records searching for any record of communications between Austin and Logan and Senator Flake and his wife during the time period relevant to the death of the dogs, but found none.

43.44. On approximately June 27, 2014, agents of the MCSO actually surveilled Senator Flake's home seeking to implicate Senator Flake in the incident, even though Austin and Logan were back at school in Utah at the time.

44.45. Sheriff Arpaio knew that his accusations of criminal conduct against Austin Flake would attract local and national media attention to the detriment of Senator Flake, all the while garnering favorable publicity for Sheriff Arpaio, self-described as "America's toughest Sheriff."

45.46. Under Sheriff Arpaio's supervision, direction, or approval, the MCSO proceeded to hire an "expert" on air conditioning systems and directed the expert to investigate why the air conditioning system at the Hughs' kennel failed.

46.47. On July 12, 2014, after examining the evidence, the expert that the MCSO hired concluded that (a) it was "very likely" that that the air conditioning system shut down "completely" and (b) the cause of the system's failure was that the homeowners, i.e., Logan's parents, had failed to timely clean or replace the filters on the system and dirty filters ultimately caused the system to fail.

47.48. Soon thereafter, under Sheriff Arpaio's supervision and/or direction, the MCSO obtained a court order for the Hughes' home electrical usage records from the Salt River Project.

48.49. On July 16, 2014, MCSO Deputy Robert Walter Kalinowski received a report from the Salt River Project detailing the electrical usage in the Hughes' home on the night of the incident (June 20, 2014) and surrounding months.

49.50. Salt River Project's report showed a forty thirty-seven percent (40%) drop in electrical usage at the Hughes' home starting in the early morning hours of June

20, 2014, as compared to every other night during that week and the previous weeks.

51.   The electrical usage at the home on June 20, 2014 also flat-lined for hours, instead of "cycling" as it had done on every other night.

50.52. The drop in electrical usage at the Hughes home in the early morning hours of June 20, 2014 was consistent with the failure of the air conditioning unit cooling the kennel.

51.53. Deputy Kalinowski also asked the Salt River Project if there were any electrical "black-outs" reported in the area that night.

52.54. The Salt River Project responded that there were no electrical black-outs in the area that night.

53.55. Notwithstanding Salt River Project's report, Deputy Kalinowski subsequently authored a report that falsely stated that the electrical usage at the home on the night of the incident was "consistent" with previous days.

54.56. The information then known to the MCSO did not support a finding of probable cause that the Flakes had intentionally harmed the deceased dogs in any way, knowingly disregarded a serious risk of harm to the dogs or otherwise knowingly engaged in any criminal conduct in reference to the death of the dogs.

55.57. To the contrary, the evidence indicated that the air conditioning system cooling the kennel had suddenly failed early in the morning of June 20, 2014, and that the Flakes did not know or have any reason to know that the air conditioning system would fail.

56.58. Notwithstanding this evidence, on September 9, 2014, Defendant Arpaio held a twenty-two (22) minute press conference to publicly announce that he was recommending that Austin and Logan Flake be charged with twenty-one (21) felony counts of animal cruelty and several related misdemeanors.

57.59. A true and correct transcript of Sheriff Arpaio's Press Conference of September 9, 2014 is attached hereto as Exhibit 2.

1   ~~58.~~60. Sheriff Arpaio's press conference served no valid law enforcement purpose and

2   was designed to (a) pressure the Maricopa County Attorney's Office into

3   bringing felony charges against Austin and Logan, (b) embarrass and damage

4   the political career of Sheriff Arpaio's perceived political adversary, Senator

5   Jeff Flake, and (c) garner favorable publicity for Sheriff Arpaio in Arizona and

6   throughout the Country.

7   ~~59.~~61. At the press conference, Sheriff Arpaio maliciously gratuitously, and falsely

8   announced that "we act on facts," and that he "was very confident that [he had]

9   the proper evidence" to support the twenty-one felony charges against the

10  Flakes.

11  ~~60.~~62. Sheriff Arpaio's remarks at his press conference regarding the Flakes falsely

12  stated or implied by means of innuendo that (a) the Flakes were guilty of "21

13  felony charges [and] several misdemeanor charges" in connection with the

14  death of the dogs," (b) were guilty of "animal cruelty," and (c) had "fail[ed] to

15  provide [the dogs with] food, water, and shelter."

16  ~~61.~~63. Under pressure from Sheriff Arpaio's repeated public accusations that Austin

17  and Logan had engaged in felonious misconduct, the Maricopa County

18  Attorney's Office presented the allegations against Austin and Logan to a grand

19  jury on Friday, October 10, 2014.

20  ~~62.~~64. The case that the Maricopa County Attorney's Office presented to the grand

21  jury against Austin and Logan was based on material misrepresentations and

22  omissions of fact made by Sheriff Arpaio and his subordinates at the MCSO.

23  ~~63.~~65. For example, MCSO Detective Marie Trombi maliciously lied to ~~falsely told~~ the

24  prosecutors at the Maricopa County Attorney's Office by falsely claiming that

25  the air conditioning system in the kennel "was on all night"; that the kennel was

26  always kept at "100 degrees"; and that the Flakes had recklessly and/or

27  intentionally killed the dogs by putting them in the kennel.

28  ~~64.~~66. Detective Trombi also maliciously ~~falsely told~~ lied to the prosecutors at the

    Maricopa County Attorney's Office by falsely claiming that the report from the

Salt River Project regarding electrical consumption at the Hughes' home on June 20, 2014 showed that the air conditioning system was "working fine all night."

65.67. In fact, the actual Salt River Project report indicated that electrical usage at the Hughes' home on June 20, 2014 "was not similar to the energy readings on the previous days during the same time or with following days during the same time" because it was approximately 40 37% lower on June 20.

66.68. In fact, the MCSO's own expert also concluded that it was "very likely" that the system had failed "completely" on June 20, 2014.

67.69. The material misstatements and omissions of the MCSO prevented the Maricopa County Attorney's Office from exercising independent prosecutorial judgment in seeking an indictment against Austin and Logan.

70. As a proximate result of the MCSO's intentional, malicious material misrepresentations and omissions to prosecutors, the grand jury ultimately indicted the Flakes for twenty-one (21) felony counts of animal cruelty, and six (6) counts of misdemeanor animal cruelty, on Tuesday, October 14, 2014.

68.71. As a proximate result of the indictment, the Maricopa County Superior Court entered an Order prohibiting the Flakes from leaving Arizona or taking care of other people's pets.

69.72. On December 2, 2014, the Flakes' legal counsel filed a Motion to Dismiss and Remand the Indictment based on the MCSO's material misrepresentations and omissions to the grand jury.

70.73. After an investigation into the grand jury proceedings and the circumstances alleged in the Flakes' Motion to Dismiss, the Maricopa County Attorney's Office moved to voluntarily dismiss the case against them "in the interest of justice" on December 23, 2014.

71.74. The criminal proceedings against the Flakes terminated in their favor when the Court ultimately dismissed the State's charges on January 7, 2015.

Count I

Malicious Prosecution

(against Maricopa County, Sheriff Arpaio, Eva Arpaio under the Fourth, Fifth, and Fourteenth Amendment to the Constitution of the United States and the common law of Arizona, and against Marie Trombi, and John Doe Trombi under federal law only)

72.75. Plaintiffs incorporate by this reference all of the paragraphs set forth above.

73.76. There was no probable cause for Defendants to recommend criminal charges against the Flakes to the Maricopa County Attorney's Office.

74.77. The criminal charges against the Flakes terminated in favor of the Flakes.

78.   Sheriff Arpaio maliciously advocated for the indictment of the Flakes to hurt his perceived political enemy, Senator Jeff Flake.

75.79. Detective Marie Trombi maliciously and intentionally lied to the prosecutors and the grand jury in order to obtain a felony indictment against Plaintiffs, which proximately caused Plaintiffs to be deprived of their constitutional rights, including (but not limited to) their right to due process, their right to travel, and their right to work in a chosen occupation.

76.——The criminal charges against the Flakes damaged their reputations, their careers and caused them to endure death threats, undue stress, anxiety, embarrassment and humiliation.

Count II

Defamation

(against Maricopa County, Sheriff Arpaio, and Eva Arpaio under the Fourteenth Amendment to the Constitution of the United States and the common law of Arizona)

77.80. Plaintiffs incorporate by this reference all of the paragraphs set forth above.

78.81. When taken as a whole, Sheriff Arpaio's remarks regarding Austin and Logan in his press release and in his press conference were false and in reckless

-10-

**Formatted:** Indent: Hanging: 0.5", Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at: 0.25" + Indent at: 0.5"

1    disregard of the truth and constituted slander per se because they stated or

2    implied that the Flakes had engaged in felonious conduct.

3    79.82. Sheriff Arpaio's remarks regarding Austin and Logan in his press release and at

4    his press conference subjected Austin and Logan to public disrepute, contempt,

5    ridicule, and repeated threats of physical violence.

6                                    Count III

7                        False Light Invasion of Privacy

8        (against Maricopa County, Sheriff Arpaio, and Eva Arpaio under the common
                                  law of Arizona)

9

10   80.83. Plaintiffs incorporate by this reference all of the paragraphs set forth above.

11   81.84. When considered as a whole, Sheriff Arpaio's remarks regarding the Flakes in

12   his press release and in his press conference created a false implication by

13   innuendo that the Flakes were cruel to animals and had committed twenty-one

14   felonies and other crimes in connection with the death of twenty-one dogs.

15   82.    As a result of Sheriff Arpaio's remarks, the Flakes have suffered and continue

16   to suffer (among other things) repeated threats of physical violence, lost income,

17   lost educational opportunities, loss of reputation, embarrassment, humiliation,

18   fear, depression, and anxiety.

19

20

21

22

23                                    Count IV

24                 Free Amendment Retaliation and Freedom of Association

25       (against Maricopa County, Sheriff Arpaio, Eva Arpaio under the Fourth, Fifth,
                and Fourteenth Amendment to the Constitution of the United States)

26

27   83.85. Plaintiffs incorporate by this reference all of the paragraphs set forth above.

28

-11-

84.86. Sheriff Arpaio advocated for the indictment of Austin and Logan Flake in order to retaliate against his perceived political enemy, the father of Austin Flake, Senator Jeff Flake, for Senator Flake's public criticism of Sheriff Arpaio.

85.87. Pursuant to Rule 38 (b) of Federal Rules of Civil Procedure, the Flakes hereby demand a trial by jury.

**WHEREFORE**, Plaintiffs respectfully request the Court to:

A. Issue a judgment declaring that the conduct of Defendants as described above violated Plaintiffs' rights under the Civil Rights Act of 1871, 42 U.S.C. § 1983, and the common law of Arizona;

B. Issue preliminary and permanent injunctions against Defendants enjoining them from committing similar unlawful acts in the future;

C. Issue a judgment awarding Plaintiffs nominal, compensatory, and punitive damages against Defendants, jointly and severally, in amounts to be determined by the finder-of-fact at trial;

D. Issue a judgment awarding Plaintiffs reasonable costs and attorney fees against Defendants pursuant to 42 U.S.C. § 1988 and any other applicable law; and

Issue a judgment awarding Plaintiffs all other relief that is just and proper against Defendants under the circumstances.

Respectfully submitted this 16th- ___ day of May _____ 2016.

**MONTOYA, JIMENEZ, LUCERO & PASTOR, P.A.**

Stephen Montoya

-12-

3200 North Central Avenue, Suite 2550
Phoenix, Arizona 85012
Attorney for Plaintiff

**RADER, SHELDON & STOUTNER, PLLC**

s/ Richard Trujillo
Richard Trujillo
11260 North Tatum Boulevard, Suite 143D
Phoenix, Arizona 85028
Attorney for Plaintiffs

I hereby certify that on May 16 _____, 2016, I electronically transmitted the
foregoing document to the Clerk of Court using the CM/ECF System for filing and
transmittal of a Notice of Electronic Filing to the following registrant:

Jeffrey S. Leonard
Sacks Tierney, P.A.
4250 North Drinkwater Blvd., 4th Floor
Scottsdale, Arizona 85251
Attorneys for Defendants

Field Code Changed

-13-

# EXHIBIT 1

*Maricopa County Sheriff's Office*
*Joe Arpaio, Sheriff*

# NEWSRelease

**For Release:** June 23, 2014                    **CONTACT:** Sheriff Joe Arpaio

## Sheriff Arpaio Promises Full Investigation into Deaths of 20 Dogs in Gilbert, AZ Boarding Facility

### "No Stone Will Go Unturned"

(Phoenix, AZ) Maricopa County Sheriff Joe Arpaio, known for his aggressive stance on animal abuse and neglect, held a press conference today shortly after meeting with several owners whose dogs died over the weekend at a Gilbert, AZ kennel. In the press conference, the Sheriff reiterated his promise to fully investigate why so many dogs died a needless and horrible death.

Sheriff Arpaio's deputies responded to a call on Saturday morning, June 21, 2014 at the Green Acres Dog Boarding Facility at 15723 East Appleby Road and found 20 dead dogs – all different breeds, sizes and ages, piled into a shed on the property.

Some owners were there when deputies arrived, all visibly upset as the kennels owners and caretakers were questioned by deputies.

"Owners claim the air conditioning was cut off after a dog chewed through some electrical wiring," Arpaio says. "But it seems unreasonable that dogs could be healthy at 11PM at night and dead by 5:30am the next morning as the owners suggest. Even the veterinarian I met with today agrees that the timeline given by the owners and caretakers is highly suspect."

550 West Jackson Street, Phoenix, Arizona 85003 | Phone (602)876-1801 | Fax (602)258-2081 | Media Contact: mediarequest@mcso.maricopa.gov

Dogs owners who met with Sheriff Arpaio today claim they were lied to and misled by the kennel's owners regarding the number of dogs being cared for there.

"Clearly, this is a situation that demands immediate and thorough investigation and I promise that my office will deliver just that," Arpaio says.

Jesse and Malesia Hughes who have operated the pet boarding business for two years were out of the state when the dogs died. The animals were being overseen by their relatives, Logan and Austin Flake.

When the Flakes discovered the dogs at 5:30 Friday morning, they attempted to save what animals they could by hosing and icing them down but failed to call for emergency assistance before the dogs died.

"There are a lot of questions that both this Sheriff and the dog's owners have and believe me by the time we are done with this investigation, we'll have the answers to most, if not all of the questions," Arpaio says. "If a crime occurred, someone will be held accountable." END

550 West Jackson St., Phoenix, Arizona 85003 | Phone (602)876-1801 | Fax (602)258-2081 | Media Contact: mediarequest@mcso.maricopa.gov

2

# EXHIBIT 2

**Page 1**

```
1         IN THE UNITED STATES DISTRICT COURT
2            FOR THE DISTRICT OF ARIZONA
3
4   Flake, et al.,      ) No. CV 01132-PHX-NVW
                        )
5                       )
       Plaintiffs,      )
6                       )
   vs.                  )
7                       )
   Arpaio, et al.,      )
8                       )
                        )
9      Defendants.      )
                        )
10
11
12
13     TRANSCRIPT OF ARPAIO PRESS CONFERENCE
14
15
16
17
18
19
20
21  REPORTED BY:
    DONNA DELAVINA, RFR      DONNA DELAVINA REPORTING, LLC
22  Certified Reporter        Arizona RRF No. R1010
    Certificate No. 50468     365 East Coronado Road
23                            Suite 210
    PREPARED FOR:             Phoenix, Arizona 85004
24  MR. STEPHEN MONTOYA       F (602) 230-5454
                              F (602) 230-8444
25  (COPY)                    donnadelavina@live.com
```

**Page 2**

```
1       (Whereupon, the press conference begins.)
2
3       SHERIFF ARPAIO:  Thank you for coming.
4   This is a pretty quick, I don't know if you want to
5   call it a press conference, but I wanted to give you a
6   brief summary of what the progress is of the situation
7   involving the Green Acre dog investigation, which we
8   started the investigation around June 21st.
9           This was an intensive investigation that
10  our detectives did over two months.  It took us out of
11  state and did some in innovative investigative
12  techniques, like hiring an air condition specialist,
13  air flow.
14          So we took this very serious, but a lot of
15  resources on this investigation.  It's an important
16  investigation.  We have the owners of the dogs very
17  concerned.  They want action.  I know that they were
18  somewhat frustrated at the time it took to complete the
19  investigation.  But, once again, we had to be very
20  thorough.  This is complicated.
21          So we finally completed the investigation.
22  We turned it over to the County Attorney for review and
23  don't forget that they had to make sure they had the
24  proper information and evidence to prosecute.  So we're
25  recommending to the County Attorney that 21 felony
```

**Page 3**

```
1   charges be pursued against the four suspects in this
2   investigation.  The four targets that we started out
3   with and I am sure that that office will review the
4   evidence and we'll see what happens.
5           I'm very confident that we have the proper
6   evidence.  And, once again, the County Attorney's
7   Office will review our evidence.  We're recommending 21
8   felony charges, several misdemeanor charges.  I didn't
9   include the two rabbits that we also filed for felony
10  charges that happened recently about two weeks ago.
11          MALE VOICE:  So you've given that case as
12  well to the County Attorney?
13          SHERIFF ARPAIO:  Yes.
14          MALE VOICE:  What was the -- what can you
15  share with us about the reason why it rose to the level
16  of a felony?  What about this case makes it a felony?
17          SHERIFF ARPAIO:  Well, I'll tell you what,
18  there is a law, anyone knowingly or intentionally, and
19  I'm going to give you the -- the crux of this case that
20  neglects -- you know, animal cruelty.  And the key
21  issue here is the failure to provide food, water, and
22  shelter.  And shelter.
23          So that's what we're basing the felony
24  charges on.  There's other misdemeanor charges, for
25  example, maybe not calling a veterinarian to get help
```

**Page 4**

```
1   for those animals.  You have to understand that 21
2   animals died in a 9-by-12 room and there were others in
3   there also.  So I think 33 animals were boarded at the
4   time.
5           So -- but that's the crux of the animal
6   cruelty law that we're going on.
7           MALE VOICE:  So each of the four suspects
8   has 21 felony charges and several misdemeanors?  Or is
9   that split up somehow?
10          SHERIFF ARPAIO:  I believe that they --
11          Do they all have it?
12          FEMALE VOICE:  Each of them.
13          SHERIFF ARPAIO:  All four.  You have the
14  of the owners, Hughes; and you have the Flakes that
15  were there, the caretakers.  So they're all being
16  charged with 21 because we have 21 victims.
17          MALE VOICE:  So why the Hugheses since
18  they weren't there?  What did they do that brings it to
19  the level of felony?
20          SHERIFF ARPAIO:  Well, the owners that
21  were in Florida?
22          MALE VOICE:  The Hughes, yes.  Yes.
23          SHERIFF ARPAIO:  Well, they were in
24  control of that facility.  They have to bear some
25  responsibility.  So we'll see how it pans out in court.
```

**Page 5**

1 I'm not going to give all the details right now. We're
2 not on trial, but I'm trying to give you the basic
3 facts of why we recommended these charges.
4      MALE VOICE: Can you tell us, did they say
5 put all the dogs in that room? Did the Hugheses give
6 those instructions?
7      SHERIFF ARPAIO: I'm not going to get into
8 all the details. That will come out in the court.
9      MALE VOICE: Sheriff, can I ask you this:
10 Of what you can't tell us, can you at least tell us
11 over the course of this investigation and the fact that
12 you now recommended these 21 felony charges, what
13 sticks out to you the most as far as any foul play,
14 anything that they could have done better? Is there
15 anything that you comment on that you learned over the
16 course of this investigation along those lines?
17      SHERIFF ARPAIO: You know, we act on
18 facts, that's why we conduct investigations. But I
19 said from the beginning that this doesn't really --
20 should have a part of this case.
21      But I always said it doesn't meet the
22 smell test when you put 28 dogs in a 9-by-12 room.
23 But, once again, we have to do the investigation, get
24 the facts, prove our case, hire air conditioning
25 technicians, experts on the flow of air, because all of

**Page 6**

1 this was, from day one, that a dog bit the -- a wire
2 that caused all of the air conditioning to go off. But
3 I would almost say that it probably didn't make any
4 difference when you look at the small room.
5      MALE VOICE: Did you guys find any
6 evidence that that claim was accurate, was true, that
7 the dogs ate through the wall?
8      SHERIFF ARPAIO: That's all going to be
9 part of our investigation that we turned in.
10      MALE VOICE: How can the people who were
11 hiring the caretakers be guilty of the exact same
12 charge that the caretakers themselves are guilty of? I
13 mean, I don't understand how they -- how they could
14 have -- or how they can be charged with the same thing
15 when you have one group of people that hired
16 caretakers, they -- you know, they've committed
17 something wrong, I guess you're saying on that end.
18 And then you have the caretakers who are responsible,
19 you're saying that all these people committed the same
20 crime, how is that possible?
21      SHERIFF ARPAIO: It's just like 21
22 felonies. Why do we have 25 (sic) felonies, because we
23 had 25 victims (sic), owners that lost their dog. And
24 also we have conspiracy charges when you do
25 investigative work, you know that. So I'm not going to

**Page 7**

1 get into all the details of why this one is charged and
2 not that one. That will come out.
3      MALE VOICE: What are the charges?
4      SHERIFF ARPAIO: I --
5      MALE VOICE: What -- what were the felony
6 charges?
7      SHERIFF ARPAIO: -- just mentioned the
8 charge, cruelty, neglect --
9      MALE VOICE: Cruelty --
10      SHERIFF ARPAIO: -- on and on. I
11 mentioned those charges to you.
12      MALE VOICE: Is conspiracy one of them,
13 felony conspiracy?
14      SHERIFF ARPAIO: I'm not sure. But we did
15 do our homework. We know what the charges are, all
16 four of them.
17      MALE VOICE: Can you at least give some
18 indication of why this is not an accident?
19      SHERIFF ARPAIO: Not a what?
20      MALE VOICE: An accident?
21      SHERIFF ARPAIO: Not an accident?
22      MALE VOICE: Yeah. Just what -- can you
23 give us any detail at all that explains how this not an
24 accident on any of the suspects' part?
25      SHERIFF ARPAIO: I think the neglect part

**Page 8**

1 of it and proper shelter, that's part of the law. I
2 don't think a 9-by-12 room with 28 dogs is proper
3 shelter to begin with. You've got the food element.
4 You have the food element, the water element, so
5 there's a lot of reasons we have these laws.
6      FEMALE VOICE: Sheriff, there were some
7 autopsies done on the dogs. Can you talk about that?
8 Have they come in yet? Were they helpful in the
9 investigation?
10      SHERIFF ARPAIO: There were seven done,
11 two different locations we pursued and -- to see if
12 there was any drugs or -- we didn't come up with
13 anything really that you would call positive for our
14 investigation.
15      MALE VOICE: What did the air flow and
16 electrical experts determine?
17      SHERIFF ARPAIO: I have no idea. I'm not
18 an expert. Once again, I'm giving you a brief summary
19 of the charges that we filed.
20      MALE VOICE: If you can kind of tell us
21 the County Attorney's involvement in all of this? Did
22 they -- are they just now getting involved or have they
23 been consulting with you guys --
24      SHERIFF ARPAIO: Well, we talked to, like
25 we always do, on any animal cruelty we do talk

1 sometimes with the expert attorney at the County
2 Attorney's Office that understands animal cruelty. So
3 we've ran some things by the lawyer. But, once again,
4 it will be up to the County Attorney's Office to
5 determine whether there's enough evidence for charges,
6 slash, conviction.
7     MALE VOICE: You say you're confident,
8 explain to us why you're so confident.
9     SHERIFF ARPAIO: Well, once again, I know
10 that my office did a thorough investigation of two
11 months, developing this case. I know, as far as I'm
12 concerned and my office is concerned, we know we did
13 the best that we could do to obtain the proper
14 evidence. And now it will be up — if charges will be
15 filed.
16     MALE VOICE: Is the investigative report
17 ready for public release yet?
18     SHERIFF ARPAIO: I don't think it is right
19 now. It's —
20     MALE VOICE: What's the holdup?
21     SHERIFF ARPAIO: Pardon?
22     MALE VOICE: What's the holdup? If you've
23 submitted it to the County Attorney's Office, how come
24 you're not releasing the report yet to the public?
25     SHERIFF ARPAIO: Well, that's a different

1 issue. I'll have to look into that whether this case
2 is finished or not.
3     MALE VOICE: Sheriff, can I ask you a
4 question, as far as —
5     SHERIFF ARPAIO: Because — excuse me.
6     MALE VOICE: So you're not releasing the
7 investigative report any time soon?
8     SHERIFF ARPAIO: Well, I'll have to
9 determine that, right? I don't know right now.
10     MALE VOICE: Why —
11     SHERIFF ARPAIO: Because I'm not —
12     MALE VOICE: That can be —
13     SHERIFF ARPAIO: I don't have the facts
14 right now whether we're going to. I don't have the
15 facts whether there could be follow-up investigation, a
16 possibility. Maybe this case not closed yet.
17     MALE VOICE: But you've submitted it to
18 the County Attorney's Office —
19     SHERIFF ARPAIO: Yes.
20     MALE VOICE: — so you're confident that
21 what you've submitted, you've submitted a chargeable
22 report.
23     SHERIFF ARPAIO: I'm confident that —
24     MALE VOICE: So why not release the report
25 to the public —

1     SHERIFF ARPAIO: I'm confident that —
2 what our office has investigated, I'm confident in the
3 expertise and professionalism. I'm confident in the
4 two months it took to put the facts together to gather
5 the proper evidence. And now it's going to be up to
6 the County Attorney to review it and it will be up to
7 him to file charges.
8     MALE VOICE: Sure. But let me put it a
9 better way, under what basis are you withholding the
10 investigative report from the public right now?
11     SHERIFF ARPAIO: I'm not — I just started
12 this right now. We'll discuss that later. This is the
13 initial press situation —
14     MALE VOICE: Sure. But you haven't given
15 any details —
16     SHERIFF ARPAIO: that I'm doing right now.
17 I'm not going to discuss whether you're going to get
18 the reports right now.
19     MALE VOICE: Well, we would like to see
20 the reports to get the details, you know.
21     SHERIFF ARPAIO: Okay. Well, call me
22 later on. Put a PI — put an FOI request in, that's
23 all you have to do, Ray.
24     MALE VOICE: Sheriff, can I —
25     MALE VOICE: So it's ready for release

1 then?
2     FEMALE VOICE: Most of us have already
3 done that and —
4     SHERIFF ARPAIO: Just put the FOI in then
5 we'll determine what the redact and if we're going to
6 release it. I'm telling you something maybe I
7 shouldn't even be talking to you guys. I'm trying to
8 keep you abreast of what's going on. And also I think
9 the victims have a right, the victims have a right to
10 know that this Sheriff did not get lost or ignore this
11 investigation.
12     We put a lot of time — there's been some
13 talk that we're — we're not doing the investigation
14 properly or we're stalling this investigation. I said
15 from the beginning that we are going to — no stone
16 unturned to get to the bottom of this. And now I'm
17 reporting to the media.
18     And now we took the final step, we
19 completed our investigation. It's over at the County
20 Attorney's Office and now we have to rely on him and
21 determine what will happen. He's the prosecutor.
22 He'll make the decision whether there's enough
23 information to charge these people.
24     MALE VOICE: Sheriff, can I ask you this?
25 I know soon after the initial death of the dogs, they

**Page 13**

1  were still caring for animals, caring for dogs. I was
2  out there one day when a guy was picking one up. Do
3  these charges stop them if they are continuing to care
4  for dogs, does this stop them in any way from
5  continuing to care for people's animals?
6      SHERIFF ARPAIO: Well, I don't think it --
7  that all depends, they -- first of all, we have to look
8  at the laws and get some laws changed or initiated
9  especially when you talk about permits and control of
10  these type of, you know, facilities to handle dogs.
11  That's another issue.
12      But right now I can't answer the question.
13  I don't know if there's anything in the laws that says
14  you can't continue on, as long as you don't violate the
15  law. I can't stop them right now from saying you can't
16  house dogs anymore. If they do it, there better be no
17  crime committed.
18      So that's -- we're in infancy stage now of
19  arrests coming up possibly and also prosecution.
20      MALE VOICE: Did you --
21      FEMALE VOICE: Can you tell us how
22  cooperative the Hughes and the Flakes were during this
23  two-month investigation.
24      SHERIFF ARPAIO: Well, they were very
25  cooperative, the Hughes, until we executed the search

**Page 14**

1  warrant. And then as far as Flake is concerned, we did
2  go out of state to talk to him. We located him and he
3  didn't want to talk and that's okay. Everybody has the
4  right to get their lawyers involved and so that's what
5  happened.
6      MALE VOICE: So did you ever talk to the
7  Flakes?
8      SHERIFF ARPAIO: Did I ever talk to them?
9      MALE VOICE: Well, did your
10  investigative --
11      SHERIFF ARPAIO: My detectives went up to
12  Provo and they talked to. . .
13      MALE VOICE: But they never interviewed
14  them?
15      SHERIFF ARPAIO: Justin.
16  Do what?
17      MALE VOICE: Austin. Did they ever
18  interview Austin Flake, as far as the investigation?
19      SHERIFF ARPAIO: They went to talk to him
20  and he decided not to talk and to see the lawyer, which
21  is okay.
22      MALE VOICE: Since then, they never were
23  able to interview him?
24      SHERIFF ARPAIO: I don't think we've
25  talked to him after that since he has a lawyer.

**Page 15**

1      MALE VOICE: Have you reached out to any
2  of the victims since the completion of investigation?
3      SHERIFF ARPAIO: The what?
4      MALE VOICE: Have you reached out to any
5  of the victims since the completion of the
6  investigation?
7      SHERIFF ARPAIO: Well, you know, I've been
8  somewhat active dealing with the victims in some of the
9  demonstrations and all that.
10      But if you're talking about today, did I
11  reach out? I'm sure they know about this -- this --
12  the talk I'm having with the press right now. I don't
13  know where they're at. But I'm sure that they
14  understand and we'll see what they have to say.
15      But, once again, we're a law enforcement
16  agency and we have to follow the rules and regulations
17  and get the facts. I feel sorry for the victims. I
18  know how they feel losing their animals. Believe me, I
19  know how they feel. I know their frustration. I'm not
20  going to criticize any frustration they have.
21      I did say from the beginning, and I think
22  we kept our promise, we're going to do everything we
23  can to get this case resolved. And I don't know if
24  there's much more that this office could do.
25      MALE VOICE: Sheriff, can I ask you,

**Page 16**

1  usually you have a gun on your tie. Is there any
2  significance to the cuffs?
3      SHERIFF ARPAIO: What do you do, look at
4  my gun? You're looking at my tie every day?
5      (Laughter.)
6      MALE VOICE: Sheriff, did you talk to
7  Senator Flake --
8      SHERIFF ARPAIO: Well, wait a minute.
9  Hold on.
10      MALE VOICE: Okay.
11      SHERIFF ARPAIO: He's asking about my gun.
12      MALE VOICE: All right.
13      SHERIFF ARPAIO: I answered your questions
14  about releasing --
15      MALE VOICE: I thought you were done with
16  that question.
17      SHERIFF ARPAIO: So what are talking about
18  whether I a -- that I have handcuffs?
19      MALE VOICE: Just --
20      SHERIFF ARPAIO: Well, you know handcuffs
21  signify -- what do handcuffs signify?
22      MALE VOICE: An arrest.
23      MALE VOICE: An arrest.
24      SHERIFF ARPAIO: Oh, very smart. Now, if
25  I had my gun, it might be a little more dangerous --

**Page 17**

1  MALE VOICE: Well, it's funny you're
2  wearing it, since there's no arrest. So why are you
3  wearing that?
4  SHERIFF ARPAIO: I'll tell you why -- you
5  want to know why? Because I didn't expect to have this
6  conference here. I didn't even have a tie. I had to
7  borrow the tie and the handcuffs, okay, because I'm
8  very professional. And so I couldn't find anything
9  else to knock this thing down on my shirt. So they're
10  handcuffs. I'm a cop. What do you want me to put on,
11  a heart?
12  (Laughter.)
13  MALE VOICE: Has Senator Flake talked to
14  you or anyone in your office about this case and his
15  son's involvement in it?
16  SHERIFF ARPAIO: You know what, I met
17  Senator Flake, quite frankly, the night of the election
18  when I was celebrating Ducey's election in the primary.
19  And he happened to come up to me and said hello and
20  very friendly and I shook his hand and that's it. We
21  discussed nothing about this situation and he did not,
22  to this day, call me or -- I think they know better any
23  way, to call the Sheriff.
24  So, no, it has nothing to do with Senator
25  Flake. It's strictly we just follow the leads and the

**Page 18**

1  surname of people have no interest to me. I don't care
2  what the name is.
3  I answered your question, right?
4  MALE VOICE: Just curious, were the
5  Hugheses and Flakes notified about the
6  recommendation --
7  SHERIFF ARPAIO: Today?
8  MALE VOICE: Yeah.
9  SHERIFF ARPAIO: No.
10  MALE VOICE: No.
11  SHERIFF ARPAIO: I'm just going public
12  because there's been a lot of controversy. They just
13  had demonstrations in front of this building on
14  Saturday. I had to let the people know what the status
15  of this case, because I do report to the people. And I
16  want to just to let them know the update. I want you
17  guys to know the update and that's what I'm doing.
18  I'm telling you right now, because you've
19  all been concerned, what's the status. I'm telling
20  you, we have completed our investigation. We're
21  recommending 20 -- we're recommending 21 felony counts
22  and misdemeanors. It's over at the County Attorney and
23  they're going to look at it and decide what to do on
24  these charges --
25  FEMALE VOICE: Sheriff --

**Page 19**

1  SHERIFF ARPAIO: -- at the time.
2  FEMALE VOICE: Sorry.
3  I don't know if you know this offhand, but
4  can you describe what -- what penalties they're looking
5  at, if they are convicted?
6  SHERIFF ARPAIO: You know, felonies are
7  serious crimes, it all depends what type. I can't get
8  into all of this. But that will come out eventually on
9  charges if charges are there. It will be outlined, you
10  know, just what the -- what the time you can do for
11  these charges.
12  FEMALE VOICE: Sheriff, I noticed that the
13  other two dogs are not listed in, you know, the
14  recommendation for these charges. Are their
15  circumstances, are they special, are they -- I won't
16  say out of the ordinary, but are you dealing with
17  different circumstances because we know of one that ran
18  away.
19  SHERIFF ARPAIO: That one ran away and the
20  dog was hit by a car and crawled to die on the side of
21  the road. That dog escaped, I presume from that area.
22  But I don't know if there's any charges on that right
23  now.
24  We do know we have 21 dogs that died. I
25  believe one of them was the owner's dog that was found

**Page 20**

1  in the backyard. So a sad situation. I'm very tough
2  on animal cruelty, as you all know. And I'm just
3  comfortable, and I will tell the victims that if I see
4  them, we did everything we could.
5  And, by the way, since then we've arrested
6  others for animal cruelty, so this isn't -- so we're --
7  whether it's horses or dogs or -- we have more coming
8  that we're going to arrest people on.
9  But this was a little different because of
10  the number of dogs and the people were very concerned
11  and interested. Not that we do it because of public
12  opinion or relation. But sometimes you have to listen
13  to the victims. They were just devastated, devastated.
14  And I'm just confident, I have to thank
15  all my detectives that worked hard around the clock,
16  probably doing one of the most exhaustive professional
17  investigations of anybody in this country when you're
18  dealing with animal cruelty. Believe me, I know, we
19  take cases that other people are not interested in.
20  MALE VOICE: Sheriff --
21  SHERIFF ARPAIO: So --
22  MALE VOICE: -- did the victims know the
23  size of the shelter before they left their animals
24  there?
25  SHERIFF ARPAIO: I --