Stephen Montoya (#011791)
Richard Trujillo (#002730)
**Montoya, Lucero & Pastor, P.A.**
The Great American Tower
3200 North Central Avenue, Suite 2550
Phoenix, Arizona 85012
602-256-6718 (telephone)
602-256-6667 (fax)
stephen@montoyalawgroup.com

Attorneys for Plaintiffs

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

Austin Flake and Logan Flake,

Plaintiffs,

v.

Joseph Michael Arpaio, Marie Trombi, and Maricopa County, Arizona,

Defendants.

No. CV 15-01132-PHX-NVW

**PLAINTIFFS' STATEMENT OF FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

(Oral Argument Requested)

Pursuant to LR Civ 56.1(b), Plaintiffs submit the following Statement of Facts in opposition to Defendants' Motion for Summary Judgment and Plaintiffs' Separate Statement of Facts in support of their Cross-Motion for Summary Judgment.

Respectfully submitted this 23rd day of March 2017.

**MONTOYA, LUCERO & PASTOR, P.A.**

Stephen Montoya
Richard J. Trujillo
3200 North Central Avenue, Suite 2550
Phoenix, Arizona 85012
Attorneys for Plaintiffs

## PLAINTIFFS' RESPONSE TO DEFENDANTS' STATEMENT OF FACTS

1.  Plaintiffs admit paragraph 1 of Defendants' Statement of Facts.

2.  Plaintiffs admit paragraph 2 of Defendants' Statement of Facts.

3.  Plaintiffs DENY paragraph 3 of Defendants' Statement of Facts, based on the facts set forth in ¶¶ 37, 44, 45, 48, 50-52, and 76-77 below.

4.  Plaintiffs admit paragraph 4 of Defendants' Statement of Facts.

5.  Plaintiffs admit paragraph 5 of Defendants' Statement of Facts.

6.  Plaintiffs admit paragraph 6 of Defendants' Statement of Facts.

7.  Plaintiffs admit paragraph 7 of Defendants' Statement of Facts.

8.  Plaintiffs admit paragraph 8 of Defendants' Statement of Facts.

9.  Plaintiffs admit paragraph 9 of Defendants' Statement of Facts.

10. Plaintiffs admit paragraph 10 of Defendants' Statement of Facts.

11. Plaintiffs DENY paragraph 11 of Defendants' Statement of Facts, based on the facts set forth in ¶¶ 37, 44, 45, 48, 50-52, and 76-77 below.

12. Plaintiffs DENY paragraph 12 of Defendants' Statement of Facts, based on the facts set forth in ¶¶ 37, 44, 45, 48, 50-52, and 76-77 below.

13. Plaintiffs DENY paragraph 13 of Defendants' Statement of Facts, based on the facts set forth in ¶¶ 37, 44, 45, 48, 50-52, and 76-77 below.

14. Plaintiffs DENY paragraph 14 of Defendants' Statement of Facts, because the expert opinion in question completely ignores the fact that Trombi repeatedly lied to the grand jury. See ¶¶ 64-77 below.

15. Plaintiffs DENY paragraph 15 of Defendants' Statement of Facts, because the expert opinion in question completely ignores the fact that Trombi repeatedly lied to the grand jury. See ¶¶ 64-77 below.

16. Plaintiffs DENY paragraph 16 of Defendants' Statement of Facts, because the expert opinion in question completely ignores the fact that Trombi repeatedly lied to the grand jury. See ¶¶ 64-77 below.

17. Plaintiffs DENY paragraph 17 of Defendants' Statement of Facts, because the

expert opinion in question completely ignores the fact that Trombi repeatedly lied to the grand jury. See ¶¶ 64-77 below.

18. Plaintiffs DENY paragraph 18 of Defendants' Statement of Facts, because the expert opinion in question completely ignores the fact that Trombi repeatedly lied to the grand jury. See ¶¶ 64-77 below.

19. Plaintiffs admit paragraph 19 of Defendants' Statement of Facts.

20. Plaintiffs admit paragraph 20 of Defendants' Statement of Facts.

21. Plaintiffs admit paragraph 21 of Defendants' Statement of Facts.

22. Plaintiffs DENY paragraph 22 of Defendants' Statement of Facts, because the declaration ignores the fact that Trombi repeatedly lied to the grand jury. See ¶¶ 64-77.

23. Plaintiffs DENY paragraph 23 of Defendants' Statement of Facts, because the declaration ignores the fact that Trombi repeatedly lied to the grand jury. See ¶¶ 64-77. Moreover, as the Court concluded in Lovejoy v. Arpaio, 2011 WL 6759552, * 22 (D. Ariz. 2011), a jury could reasonably reject a prosecutor's claim of exercising independent judgment based on the adverse "professional consequences of admitting to prosecuting under pressure despite their independent judgment."

24. Plaintiffs admit paragraph 24 of Defendants' Statement of Facts.

25. Plaintiffs admit paragraph 25 of Defendants' Statement of Facts.

26. Plaintiffs admit paragraph 26 of Defendants' Statement of Facts.

27. Plaintiffs admit paragraph 27 of Defendants' Statement of Facts.

28. Plaintiffs DENY paragraph 28 of Defendants' Statement of Facts, because Sheriff Arpaio's various public statements regarding the Flakes speak for themselves and when considered as a whole in fact did falsely accuse the Flakes of either simple misconduct or criminality. See Plaintiffs' Response in Opposition to Defendants Motion for Summary Judgment, Section C, pp. 12-15.

29. Plaintiffs admit paragraph 29 of Defendants' Statement of Facts.

30. Plaintiffs admit paragraph 30 of Defendants' Statement of Facts.

## PLAINTIFFS' SEPARATE STATEMENT OF FACTS

31. In June 2014, Austin Flake and Logan Flake were a young married couple from the East Valley of Maricopa County, Arizona living in Provo, Utah, where Austin was attending Brigham Young University. See Plaintiffs' Third Amended Complaint, ¶¶ 14-16, and Defendants' Answer to Plaintiffs' Third Amended Complaint, ¶¶ 14-16.

32. Austin had just turned twenty-one years-old, and Logan was only twenty years-old. Id.

33. Austin is the son of United States Senator Jeff Flake of Arizona. Id.

34. On Saturday, June 14, 2014, Austin and Logan were back in Gilbert, Arizona at the home of Logan's parents, Jesse and MaLeisa Hughes, who were in the state of Florida with their fourteen year-old daughter who was playing in a volleyball tournament. Id. at ¶ 17.

35. Austin and Logan were responsible for taking care of four of Logan's younger siblings, as well as tending to the dog kennel that Logan's parents operated out of their home. Id. at ¶ 18.

36. The Hughes' kennel sometimes boarded approximately 15 to 30 dogs. Id. at ¶ 19.

37. From the night that Austin and Logan arrived at the Hughes' home on Saturday, June 14, 2014, they cared for the dogs in accordance with the Hughes' instructions for almost a week (specifically, five days) in the same manner without incident. See Grand Jury Transcript, p. 18, lines 2-10; p. 93, line 22 to p. 94, line 23; p. 96, lines 2-15, attached as Exhibit 1.

38. However, in the early morning hours of Friday, June 20, 2014, the air conditioning system that cooled the kennel unexpectedly stopped working. Id. at p. 22, lines 6-23; p. 24, line 25 to p. 25, line 17. See also Defendants' Motion for Remand, attached as Exhibit 2, at Exhibit A, ¶¶ 4-9, and Exhibit B, ¶¶ 3-20.

39. Because the air conditioning system unexpectedly failed, the temperature in the kennel increased substantially overnight, and this ultimately resulted in the tragic

deaths of twenty-one dogs housed in the kennel for the night—including Logan's own family pet, "Patrick," who slept in the kennel with the rest of the dogs.  Id. See also Exhibit 2, at Exhibit G, pp. 1, 4.

40. When Logan's parents learned of the deaths of the dogs in the early morning hours of Friday, June 20, 2014, they aborted their trip and returned home to Gilbert from Florida later that same day.  See Exhibit 1, p. 19, line 6 to p. 20, line 23.

41. On the very next day, Saturday, June 21, 2014, deputies from the Maricopa County Sheriff's Office went to the Hughes' home to investigate the deaths of the dogs. Exhibit 1, p. 12, lines 17 to 23; p. 18, lines 11-17.

42. Mr. Hughes told the deputies that the dogs had died during the night because the air conditioning system in the kennel had unexpectedly failed.  Exhibit 1, p. 21, lines 8-10.

43. Mr. Hughes also speculated that the system failed because an electrical wire in the kennel may have been chewed-through by a dog.  Exhibit 1, p. 21, lines 3-10.

44. When Austin was interviewed by the deputies, he told them that he had kenneled the dogs after they had been outside at around 8:00 p.m. on Thursday, June 19, 2014, and the kennel was cool and the air conditioning system was working fine. Exhibit 1, p. 24, line 25 to p. 25, line 17.  See also Deposition of Austin Flake, p. 263, lines 14-21, attached as Exhibit 3.

45. Logan also told the deputies that she had checked on the dogs one last time before going to bed at approximately 11:00 p.m. on Thursday, June 19, 2014, and the dogs were fine.  Exhibit 1, p. 22, line 6 to p. 24, line 12.

46. However, when Austin went back in the kennel to check on the dogs early the next morning at around 5:30 a.m. on Friday, June 20, 2014, the room was more than 100 degrees, the air conditioning system was not working and approximately twenty-one dogs had died or were dying.  Exhibit 1, p. 24, line 25 to p. 25, line 8.

47. Logan confirmed these facts.  Exhibit 1, p. 22, line 6 to p. 24, line 17.

48. Neither Austin nor Logan had any reason to either believe that the air conditioning

system cooling the kennel was in ill repair or to anticipate that it would fail because the system had successfully cooled the kennel without incident for the five previous nights. Exhibit 1, p. 93, line 22 to p. 94, line 23; p. 96, line 2 to p. 97, line 6. See also Deposition of Logan Flake, p. 273, line 19 to p. 274, line 13, attached as Exhibit 4, and Exhibit 3, p. 262, line 4 to p. 263, line 21.

49. Austin and Logan did not live in the Hughes' home and were only there for the week to care for Logan's younger siblings and the dogs while the Hughes were away in Florida. Exhibit 1, p. 18, lines 2-10.

50. The Hughes' home was equipped with several air conditioning units, and the unit cooling the side of the house that Austin and Logan slept in continued to work and cool their side of the house all night. See Exhibit 4, p. 269, line 10 to p. 270, line 13; p. 272, line 6 to p. 273, line 22.

51. Accordingly, it is undisputed that Austin and Logan had arrived at the Hughes' home on Saturday, June 14, 2014, and the air conditioning system in the kennel had worked fine all week—for five (5) full days—until it unexpectedly failed in the early hours of Friday, June 20, 2014. See Exhibit 1, p. 96, lines 2-22; p. 94, lines 13-20.

52. As the lead investigator for the Maricopa County Sheriff's Office assigned to investigate the incident, Detective Marie Trombi, acknowledged:

> Q. Austin and Logan have indicated that everything they did was what the Hugheses told them to do?
>
> A. Yes.
>
> Q. And that their parents have been doing this with 20 to 25 or more dogs for well over a year and a prior summer and they've never had any problems?
>
> A. Correct.
>
> Q. . . . . they being the Flakes, had been doing this job for six straight nights, and when they went in in the morning, this was the first morning in six straight

nights that they found a whole roomful of dead dogs or close-to-dying dogs?

A. Yes. This is the only incident. That's what you mean?

Q. Correct.

A. Yes.

Q. So the time that the Flakes were doing this, they were doing the same thing each and every night. And it wasn't until the night of the 19th to 20th that now they found this problem.

A. Correct.

Q. And Austin and Logan did not believe they were harming these dogs?

A. Correct.

Q. And Jesse and Maleisa have indicated similar things, that they've been doing this forever and they did not believe they were hurting these dogs?

A. Correct.

Q. And again, just to be clear, they've indicated they put their own dog in this room with all these other dogs?

A. The Hugheses?

Q. The Hugheses did.

A. Yes.

Q. And the Flakes actually put the dog in the room with the other dogs?

A. Yes.

Exhibit 1, p. 96, line 2 to p. 97, line 5.

53. Accordingly, on June 22, 2014, the Maricopa County Sheriff's Office told the media that the death of the pets was a "tragic accident." See attached Exhibit 5.

54. However—on the very next day—June 23, 2014, Maricopa County Sheriff Joseph Arpaio issued a press release regarding the death of the twenty-one dogs at the kennel, (a) proclaiming himself "aggressive" on "animal abuse and neglect," (b) promising a "full investigation" in which "no stone will go unturned," (c) falsely claiming that information "given by the owners and caretakers [was] highly suspect," and (d) identifying Logan and Austin Flake by name as the wrongdoers. See attached Exhibit 6.

55. Sheriff Arpaio would ultimately issue three more press releases regarding the incident. See Exhibits 7, 8, and 9.

56. Moreover, on September 9, 2014, after the MCSO's had concluded its "investigation" of the Flakes, Sheriff Arpaio held a twenty-two (22) minute press conference publicly announcing that he was recommending that Austin and Logan Flake be charged with twenty-one (21) felony counts and six (6) misdemeanor counts of animal cruelty. See attached Exhibit 10.

57. At the press conference of September 9, 2014, Sheriff Arpaio gratuitously announced that that he "*was very confident that [he had] the proper evidence*" and "*we act on facts*," to support the filing of twenty-one felony charges against Austin and Logan. Exhibit 10, p. 3, lines 56; p. 5, lines 17-18.

58. Sheriff Arpaio also announced that the Flakes' claim that the air conditioning system had failed in the kennel did not "*meet the smell test*" and that the Flakes had failed to provide the dogs with adequate food, water and shelter. Exhibit 10, p. 5, lines 21 to p. 6, line 4.

59. Sheriff Arpaio's public statements suggesting that Austin and Logan were guilty of twenty-one felonies and six misdemeanors were not without consequence—at least for Austin and Logan. See ¶¶ 30 and 31 below.

60. In fact, the incident received widespread local and national news coverage.  See attached Exhibit 11.

61. The Flakes were also publically vilified, plagued by threats of violence and literally feared for their lives.  Exhibit 3, p. 274, line 11 to p. 275, line 12; Exhibit 4, p. 232, line 9 to p. 240, line 3.

62. Moreover, based on Sheriff Arpaio and Detective Trombi's recommendation, the Maricopa County Attorney's Office presented the allegations against Austin and Logan to a grand jury on Friday, October 10, 2014.  See Exhibit 1, p. 2, line 24 to p. 3, line 2, Defendants' Statement of Facts, ¶ 20.

63. However, the case that the Maricopa County Sheriff's Office presented to both the prosecutors and the grand jury against Austin and Logan was based on intentional, reckless, material misrepresentations and omissions of fact made by Detective Marie Trombi, the MCSO's chief investigator in the case.  See ¶¶ 34-37 below.

64. Specifically, Detective Trombi repeatedly and falsely told the prosecutors at the Maricopa County Attorney's Office that the air conditioning system in the kennel "was on all night," which suggested that the kennel was always kept at "100 degrees" and that the Flakes had killed the dogs by putting them in the kennel.  See Exhibit 1, p. 23, lines 20-22; p. 98, line 23 to p. 99, line 8.

65. Detective Trombi also falsely told the prosecutors and the grand jury that a Report from the Salt River Project ("SRP") regarding electrical consumption at the Hughes' home on June 20, 2014 the day the dogs died showed that the air conditioning system "was working fine all night."  See ¶¶ 36 and 37 below.

66. Specifically, in response to a specific question by a grand juror, Trombi claimed that:

> GRAND JUROR:    I'd like to clarify also.  So the air was working and on until 5:30 that morning when he tried to fix it, Austin Flake tried to fix it, correct?  *That's what SRP said?*
>
> MARIE TROMBI:    *That's going by SRP records, yes.*

GRAND JUROR: That it was on?

MARIE TROMBI: *It was on, all night.*

GRAND JUROR: All night?

MARIE TROMBI: *All night.*

GRAND JUROR: Thank you.

Exhibit 1, p. 98, line 23 to p. 99, line 8, (emphasis added).

67. Similarly, Detective Trombi testified that:

Q. So the SRP report shows that the air was working fine all night?

A. Yes.

Exhibit 1, p. 92, lines 19-21.

68. However, contrary to Detective Trombi's testimony, the Salt River Project Report indicated that electrical usage at the Hughes' home on June 20, 2014 "was *not* similar to the energy readings on the previous days during the same time or with following days during the same time" because it was approximately 37% *lower* on June 20 when the dogs died—which fully supports Austin and Logan's testimony that the air conditioning unit cooling the kennel unexpectedly failed. See Exhibit 2, at "Exhibit A," ¶¶ 4, 8, and "Exhibit B," ¶¶ 2-20.

69. In fact, the Salt River Project Report was consistent with the air conditioning unit cooling the kennel turning off completely at 2:00 a.m. in the morning of Friday, June 20 when the dogs died. See Exhibit 2, at Exhibit B, ¶ 8.

70. Moreover, the MCSO's own air conditioning "expert," Mr. George Hogge, concluded that it was "very likely" that the "interior coil" on the air conditioning system cooling the kennel had "frozen" and rendered the system "completely ineffective." See Exhibit 2, at "Exhibit H," p. 3 (#000656).

71. However, when asked by the prosecutor whether Mr. Hogge's report showed that the air conditioning was working, Detective Trombi failed to disclose that Mr. Hogge had concluded that the system had in fact "frozen." See ¶ 43 below.

72. Instead, Trombi lied to the prosecutor and the grand jury by claiming that Mr. Hogge's report showed that the air conditioning unit cooling the kennel "was working." Exhibit 1, p. 89, line 9 to p. 91, line 25.

73. Specifically, Trombi testified as follows:

> Q. Did the sheriff's office hire an engineer George, Hogge, H-o-g-g-e, to do an HVAC report?
>
> A. Yes.

Exhibit 1, p. 89, lines 9-11.

> Q. Tell us what the HVAC people said.
>
> A. So the HVAC people did a complete systems check, all electrical on the house, the system check on the air conditioning. . . They found no malfunction with the air conditioning during all their testing.
>
> Q. So there was air conditioning that went into this room?
>
> A. There was one vent in that room.
>
> Q. And did the HVAC report indicate that they thought it was inadequate for that room?
>
> A. They thought that the room size and the ventilation, the system itself was inadequate for what the room was used for.
>
> Q. But it was working?
>
> A. It was working.

Exhibit 1, p. 90, lines 20-23, p. 91, lines 1-13.

74. Accordingly, Detective Trombi repeatedly *lied* by falsely telling the prosecutor that the air conditioning system in the kennel "worked all night." <u>See</u> ¶¶ 34-43 above.

75. In fact, the air conditioning system cooling the kennel unexpectedly failed and caused the dogs to overheat and die, making the incident a "tragic accident" that the official spokesperson of the MCSO admitted in the first place, instead of something intentionally, knowingly or recklessly felonious. <u>See</u> ¶¶ 34-43 above.

76. Detective Trombi also told the Grand Jury that "the [Hughes] keep [the window] closed when they put dogs in" and that when "the three doors are shut…they are sealed off tightly." Exhibit 1, p. 29, lines 11-17.

77. However, Logan Flake informed the deputies investigating the case that the window was partly open on the night of the incident during their initial investigation. See Exhibit 2, p. 4, n. 6; Exhibit 4, p. 266, line 19 to p. 268, line 4.

78. As a proximate result of the MCSO's material misrepresentations and omissions to the prosecutors and the grand jury, on October 10, 2014, the grand jury ultimately indicted the Flakes for twenty-one (21) felony counts of animal cruelty under A.R.S. § 13-2910(8), and six (6) counts of misdemeanor animal cruelty under A.R.S. § 13-2910(1)(2). See attached Exhibit 12.

79. Based on their Indictments, the Flakes were ordered not to leave the state or to care for the animals of any third-party. See attached Exhibit 13.

80. On December 2, 2014, the Flakes' defense counsel filed a Motion for Remand based on the MCSO's material misrepresentations and omissions. See Exhibit 2.

81. After investigating the circumstances alleged in the Flakes' Motion for Remand, the Maricopa County Attorney's Office moved to voluntarily dismiss the case against them on December 23, 2014. See attached Exhibit 14.

82. Maricopa County Attorney Bill Montgomery explained his decision to move to dismiss the charges as follows:

> "After thoroughly reviewing the records and fairly considering the points raised in recent Defense motions, the theory of the case as initially presented to the Grand Jury did not take into account the possibility that there were issues with an air conditioning unit," said Maricopa County Attorney Bill Montgomery. "This could impact a Grand Jury's charging decision and how we might present a case to a trial jury," he added.
>
> . . .
>
> "The State will confer with the investigators and experts to ensure any open questions about the events that occurred at the Green Acre facility are fully answered before making a

> decision on re-charging allegations of animal cruelty," Montgomery said. "Our motion to dismiss the charges without prejudice reflects our ethical and professional duty as prosecutors to review information presented to us by the defense and to assess what impact, if any, it has on our case."

See attached Exhibit 15.

83. The criminal proceedings against the Flakes terminated in their favor when the Court ultimately granted the State's Motion to Dismiss and dismissed all charges against Austin and Logan on January 7, 2015. See attached Exhibit 16.

84. After the Superior Court dismissed the criminal charges against Austin and Logan, Sheriff Arpaio issued yet another press release (Exhibit 9 [001077]) and a videotaped message to the public (also available for the world to see on YouTube, https://youtu.be/bjCZy2G4g00, a transcript of which is attached as Exhibit 9, p. 1-4), stating that, "I anticipate the charges will be re-filed regarding the facts that we obtained doing our investigation," and that the "criminal justice system, I feel, will prevail and justice will be done."

85. In Detective Trombi's deposition, she admitted that Austin and Logan did *not* do anything to purposely or intentionally harm the kenneled dogs. As she testified:

> Q. . . . Do you believe that Logan Flake intentionally tried to hurt those dogs in that animal room?
>
> A. No.
>
> Q. Do you believe that she knowingly attempted to hurt those dogs in that animal room?
>
> A. No.
>
> Q. Do you believe that Austin intentionally tried to hurt those dogs in that animal room?
>
> A. No.
>
> Q. Do you believe that he knowingly tried to hurt those dogs in that animal room?
>
> A. No.

Q. Did you uncover any evidence that this young lady [Logan] and that young man [Austin] were sadistic in reference to animals?

A. No.

See Exhibit 17, p. 249, lines 15-25, p. 250, lines 1-6.

Q. . . . if those animals had been put in the same room repeatedly by Austin, by Logan, and in the morning they came out healthy, hungry and happy, how could that be trying to hurt those poor dogs?

A. I just told you, I don't believe they tried to hurt the dogs. But they intentionally put them in that room that led to their deaths.

Exhibit 17, p. 252, lines 2-10.

86. Detective Trombi also admitted that Austin and Logan could *not* have anticipated any failure of the air conditioning system cooling the kennel. Trombi testified that:

Q. . . . Austin stated that he and Logan had just let the dogs in the room, they typically sleep inside. Austin stated the room appeared cool and the air conditioning appeared to be working on the west side of the residence.

Is that what he's always said?

A. That's what he reported that day, yes, to that officer.

Q. Do you have any reason to believe that's false?

A. No. At that time, I had no reason to believe that it was a false statement. I had no reason to disbelieve their statements, whatsoever.

Q. Now, you have lived in Phoenix for a good long while?

A. Yes.

Q. And you have an AC at your home, right?

A. Yes.

Q. Has it ever broken down?

A.     Yes.  Well, the power has gone out.

Q.     Has your AC ever broken?

A.     Yes, actually.

Q.     Was it your fault?

A.     No.

Q.     Did you know it was going to break when it broke?

A.     It was very noisy.  But, no, I didn't know when it was going to break.

Q.     So based on your common sense, which is considerable, I concede, isn't it true that air conditioners break all the time in the summertime in Arizona unexpectedly?

A.     I would agree.

Exhibit 17, p. 256, lines 9-25, p. 257, lines 1-15.

87.    Detective Trombi also admitted that Austin and Logan were *not* responsible for the allegedly poor ventilation in the kennel:

Q.     Okay.  You said in such a small place, you didn't include the lack of – the alleged lack of ventilation, did you?

A.     Not for Austin and Logan.

Q.     That was more their parents' problem, right?

A.     Right.

Exhibit 17, p. 281, lines 14-25, p. 282, lines 1-9.

88.    Instead, Trombi claimed that Austin and Logan's *only* fault was that they (somehow) knew that they were subjecting the dogs to peril by leaving them in a nine by twelve foot room.

Q.     Do you think that Logan knew that the dogs were going to die if she placed them in that room when the AC was working and they had been placed in that room night

after night without incident?

A.   No.

Q.   Do you think Austin knew that the dogs were going to die by putting them all in that room after he had done the same thing night after night without incident?

A.   No.

Exhibit 17, p. 255, lines 1-10.

Q.   Didn't Austin and Logan tell your colleagues at the Maricopa County Sheriff's Office that: Hey, we put them in that room because our parents told us to and we had no reason to think there was anything wrong with it because every time we put them in the room, the dogs came out fine. Didn't they say that?

A.   Yes.

Q.   Well, are you blaming Austin and Logan for the alleged poor ventilation in that room?

A.   I think I went over what I charged them and why and that was putting so many animals in such a small space, that is shelter.

Q.   Okay.

A.   They should have known better.

Exhibit 17, p. 281, line 14 to p. 282, line 9.

89.   At her deposition, Trombi also admitted that she and her colleagues repeatedly briefed Arpaio on the status of their investigation and that she could not remember another case in which she briefed Arpaio as much. Exhibit 17, p. 181, line 17 to p. 184, line 19; p. 206, lines 18-22.

90.   At his deposition, Sheriff Arpaio also admitted that he had released several press releases and participated in several press conferences regarding the death of the dogs. See Exhibit 18, p. 161, line 20 to p. 164, line 14.

91.     Notwithstanding Sheriff Arpaio's multiple briefings, press releases and press conferences, he was unable to specify even *one* fact supporting his recommendation that Austin and Logan be prosecuted for 21 felony counts of animal cruelty:

> Q.      . . . . Sheriff Arpaio, when you announced, "I'm very confident that we have the proper evidence," unquote, what evidence were you talking about?
>
> A.      I'm going by what my detectives accomplished during their investigation . . . .
>
> Q.      Can you specify any fact that would fall into the category of the – in the realm of the evidence that you were "very confident" that we had.  I'm reading from page 3, lines 5 through 6 [of the transcript of his press conference of September 9, 2014].
>
> A.      I said, "I'm very confident at the proper evidence"
>
> . . . .
>
> Q.      I understand that, Sheriff Arpaio.  Now I'm asking you to specify what that evidence was?
>
> A.      I'm not going to specify. . . .
>
> Q.      . . . so you can't tell me—you can't specify one shred of evidence that gave rise to your confidence?
>
> A.      No.

Exhibit 18, p. 133, lines 1-4, 9-12, 18-20, 25; p. 134, lines 1-3.

92.     Towards the very end of his deposition, Arpaio testified that:

> Q.      Sheriff Arpaio, now that you've had all day to think about it. Tell me what Logan Flake did to those dogs that was intentional and violative of the law?
>
> A.      Once again, I'm going to rely on the detectives and the prosecutors that were involved in this investigation.
>
> Q.      Tell me, now that you've had the chance to think about it, what Austin Flake did that was intentional and violative of the law in reference to those dogs?

A. I don't have an answer for that.

Exhibit 18, p. 205, line 23 to p. 206, line 16.

93. In fact, Sheriff Arpaio was even unable to specify what statute predicated his recommendation that Austin and Logan be prosecuted for 21 felony counts of animal cruelty:

Q. Was there a specific law that you were accusing them of violating?

A. I don't have that knowledge right now.

Exhibit 18, p. 137, lines 12-16.

94. Although Sheriff Arpaio was aware that his subordinate Marie Trombi had been accused of lying to the prosecutors and the grand jury, in addition to withholding material exculpatory evidence from the prosecutors, he testified that he did *not* know whether he or his office ever investigated the allegations of misconduct against her or if she was ever disciplined for such misconduct. Exhibit 18, p. 190, line 4 to p. 195, line 1.

95. Moreover, notwithstanding the substantial evidence that Trombi had lied to the prosecutors, Arpaio continued to praise her work on the case and "stand" by her testimony:

Q. Marie Trombi was in charge of the investigation, wasn't she?

Q. And do you think she did a good job?

A. Yes.

Q. Do you stand by what she said?

A. Yes.

Exhibit 18, p. 202, lines 7-16.

Respectfully submitted this 23rd day of March 2017.

**MONTOYA, LUCERO & PASTOR, P.A.**

Stephen Montoya
Richard J. Trujillo
3200 North Central Avenue, Suite 2550
Phoenix, Arizona 85012
Attorneys for Plaintiffs

I hereby certify that on March 23, 2017, I electronically transmitted the foregoing document to the Clerk of Court using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following registrants:

Jeffrey S. Leonard
Evan F. Hiller
Sacks Tierney, P.A.
4250 North Drinkwater Blvd., 4th Floor
Scottsdale, Arizona 85251
Attorneys for Defendants