1  **WO**

6        IN THE UNITED STATES DISTRICT COURT

7            FOR THE DISTRICT OF ARIZONA

9  Austin Flake and Logan Flake,              No. CV-15-01132-PHX-NVW

10            Plaintiffs,                      **ORDER**

11  v.

12  Joseph M Arpaio, Ava J Arpaio, County of
    Maricopa, Maricopa County Board of
13  Supervisors, Marie Trombi, and John Doe
    Trombi,
14
              Defendants.
15

17        Before the court are Defendant's Motion for Summary Judgment (Doc. 107),

18  Plaintiffs' Response and Cross-Motion for Summary Judgment (actually a cross-motion

19  for partial summary judgment) (Doc. 114), and the parties' accompanying briefs.

21  **I.      FACTUAL BACKGROUND**

22        Except where noted, the following facts are not in dispute.  In 2014, plaintiffs

23  Austin Flake ("Austin") and Logan Brown ("Logan") (collectively "the Flakes") were

24  married and living together in Provo, Utah.[1]  (Doc. 113, ¶ 31; Doc. 121, ¶ 31.)  Austin is

25  the son of United States Senator Jeff Flake.  (Doc. 113, ¶ 33; Doc. 121, ¶ 33.)  In 2014,

26  Logan's parents, Jesse and MaLeisa Hughes ("the Hugheses") ran a dog kennel business

---

28        [1] Logan's last name at the time of the incident was Flake.  It is now Brown.  (Doc.
    107 at 1.)

out of their Gilbert, Arizona home.  (Doc. 113, ¶¶ 34-35; Doc. 121, ¶¶ 34-35.)   The kennel consisted of a small, air-conditioned room attached to the house where the Hugheses would board anywhere from fifteen to thirty dogs at a time.  (Doc. 113, ¶ 36; Doc. 121, ¶ 36.)  The room was roughly nine feet by twelve feet in size.  *See* Doc. 108-3 at 6.

On June 14, 2014, the Flakes arrived in Gilbert to take care of the property, including the kennel, while the Hugheses went out of town.  (*Id.*)  The first five days passed without incident.  (Doc. 113, ¶¶ 37, 48; Doc. 121, ¶¶ 37, 48.)  The Flakes stayed in the main part of the house, which was separate from the kennel space and had its own independent air conditioning unit that functioned properly throughout their stay.  (Doc. 113, ¶ 50; Doc. 121, ¶ 50.)  However, at approximately 5:30 AM on Friday, June 20, Austin went to check on the kennel and found the room so hot that the twenty-one dogs had either died or grown seriously ill.  (Doc. 113, ¶ 46; Doc. 121, ¶ 46.)  (Some of the dogs still living died shortly thereafter, though some may have survived.  *See* Doc. 108-1 at 170.)  The Flakes maintain that the air conditioning unit inside the kennel room malfunctioned sometime after 11:00 PM the night before when Logan last checked on the dogs.  (Doc. 113, ¶¶ 38, 45.)  Defendants say the air conditioning was functioning normally but was simply inadequate to accommodate that many dogs in such a small space with insufficient ventilation.  (Doc. 121, ¶ 39.)  The parties also disagree as to whether a window in the room was left slightly open.  (Doc. 113, ¶ 77; Doc. 121, ¶ 77.)  The Flakes did not provide water for the dogs throughout the night.  (Doc. 108, ¶ 4; Doc. 113, ¶ 4.)

The next day, deputies from the Maricopa County Sheriff's Office ("the Sheriff's Office"), then headed by defendant Sheriff Joseph Arpaio, came to the Hugheses' home to investigate.  (Doc. 113, ¶ 41; Doc. 121, ¶ 41.)  In a statement issued to the media shortly after, the Sheriff's Office referred to the incident as a "tragic accident."  (Doc. 113, ¶ 53; Doc. 121, ¶ 53.)  Eight days later, on June 23, 2014, the Sheriff's Office issued a press release headlined "Sheriff Arpaio Promises Full Investigation into Deaths of 20

Dogs in Gilbert, AZ Boarding Facility," portions of which read as follows:

"No Stone Will Go Unturned"

(Phoenix, AZ) Maricopa County Sheriff Joe Arpaio, known for his aggressive stance on animal abuse and neglect, held a press conference today shortly after meeting with several owners whose dogs died over the weekend at a Gilbert, AZ kennel. In the press conference, the Sheriff reiterated his promise to fully investigate why so many dogs died a needless and horrible death.

Sheriff Arpaio's deputies responded to a call on Saturday morning, June 21, 2014 at the Green Acres Dog Boarding Facility at 15723 East Appleby Road and found 20 dead dogs – all different breeds, sizes and ages, piled into a shed on the property.

. . . .

"Owners claim the air conditioning was cut off after a dog chewed through some electrical wiring," Arpaio says. "But it seems unreasonable that dogs could be healthy at 11PM at night and dead by 5:30am the next morning as the owners suggest. Even the veterinarian I met with today agrees that the timeline given by the owners and caretakers is highly suspect."

. . . .

"Clearly this is a situation that demands immediate and thorough investigation and I promise that my office will deliver just that," Arpaio says.

Jesse and Malesia Hughes who have operated the pet boarding business for two years were out of the state when the dogs died. The animals were being overseen by their relatives, Logan and Austin Flake.

. . . .

(Doc. 113-6 at 87-88.)

The Sheriff's Office then initiated an investigation. (Doc. 108, ¶ 6; Doc. 113, ¶ 6.) Two experts, veterinarian Bernard Mangone and electrical engineer George Hogge,

supplied the Sheriff's Office with reports that were used in the Sheriff's investigative report. (Doc. 108, ¶ 9; Doc. 113, ¶ 9.) Hogge concluded that the air conditioning system in the kennel was "inadequate and improperly configured" for the room, but he also said the air conditioner operated all night. (Doc. 108, ¶ 10; Doc. 113, ¶ 10.) Mangone concluded that the dogs would not have had adequate space or water in the room. (Doc. 108-5 at 5-6.) Defendant Marie Trombi, a deputy sheriff, was appointed to investigate the case. (Doc. 108-4 at 15.) She "repeatedly briefed Arpaio" on the ongoing investigation. (Doc, 113, ¶ 89; Doc. 121, ¶ 89.)

On September 9, 2014, Arpaio held a twenty-two minute press conference announcing that he was recommending to the Maricopa County Attorney that the Flakes and the Hugheses be charged with twenty-one felony counts and six misdemeanor counts of animal cruelty.[2] (Doc. 113, ¶ 56; Doc. 121, ¶ 56.) In the course of the press conference, Arpaio stated, "I'm very confident we have the proper evidence" and that "we act on facts" in investigating cases. (Doc. 61-1 at 5; Doc. 113, ¶ 57; Doc. 121, ¶ 57.) Arpaio further stated, "I always said it doesn't meet the smell test when you put 28 dogs in a 9-by-12 room." (Doc. 113-7 at 12.)[3]

On October 10, 2014, prosecutors took the matter before a grand jury for indictment of the Flakes and the Hugheses. (Doc. 113, ¶ 62; Doc. 121, ¶ 62.) Defendant Marie Trombi, a deputy sheriff, testified during that proceeding to what the Flakes call "material misrepresentations and omissions" regarding the kennel. *See* Doc. 113, ¶¶ 63-

---

[2] Defendants vigorously maintain that it was the Sheriff's Office, not Arpaio personally, who recommended prosecuting the Flakes. *See* Doc. 121, ¶¶ 91-93. The difference does not matter, as Sheriff Arpaio announced the recommendations and his own confidence in them. The "Sheriff's Office" is not a legal entity. It is a convenient label for the organization the sheriff directs. The sheriff is the constitutional officer for the county. Ariz. Const. Art. XII, § 3; A.R.S. § 11-401(a)(1). The sheriff is the final actor for the county on most matters, which are not subject to review by any other actor or body for the county. Only the sheriff and the county can sue or be sued.

[3] The Flakes characterize Arpaio as having said "that the Flakes' claim that the air conditioning system had failed in the kennel did <u>not</u> '*meet the smell test*' and that the Flakes had failed to provide the dogs with adequate food, water and shelter." (Doc. 113, ¶ 58 (emphasis in original).) The portion of the press conference transcript to which they point very clearly says neither of those. *See* Doc. 113-7 at 12.

65; Doc. 121, ¶¶ 63-65.  Trombi testified that the building's electric records show the air conditioning was on and working all night until 5:30 AM the morning of Friday, June 20. (Doc. 113, ¶ 66; Doc. 121, ¶ 66.)  Hogge's expert report, which was accessible to Trombi at the time, concluded that the air conditioning unit was "inadequate and improperly configured" for the room, in addition to being poorly maintained.  (Doc. 108-3 at 4.) Hogge also concluded that there was "no evidence of any electrical or mechanical failure of the HVAC system."  (Doc. 108-3 at 24.)  Grand jurors specifically questioned Trombi about whether the air conditioner was on.  She answered that, according to the Flakes' electrical records, it was on all night.  (Doc. 113, ¶ 66; Doc. 121, ¶ 5.)  In any event, the grand jury indicted the Flakes on twenty-one felony counts and six misdemeanor counts of animal cruelty.  (Doc. 113, ¶ 78; Doc. 121, ¶ 78).  The Flakes were never arrested. (Doc. 108, ¶ 19; Doc. 113, ¶ 19.)  They were, however, restricted from leaving the state of Arizona and from having "custody or control over another person's animal/pet."  (Doc. 113-7 at 64.)

Two months later on December 2, 2014, the Flakes filed a motion to return the case to the grand jury in light of "material misrepresentations and omissions" in Trombi's testimony.  (Doc. 113, ¶ 80; Doc. 121, ¶ 80.)  Three weeks later, prosecutors from the County Attorney's Office voluntarily dismissed the case.  (Doc. 113, ¶¶ 81, 83; Doc. 121, ¶¶ 81, 83.)  Maricopa County Attorney Bill Montgomery told the press that "the theory of the case as initially presented to the Grand Jury did not take into account the possibility that there were issues with an air conditioning unit."  (Doc. 113, ¶ 82; Doc. 121, ¶ 82.) Montgomery said that the dismissal "reflects our ethical and professional duty as prosecutors to review information presented to us by the defense and to assess what impact, if any, it has on our case."  (*Id.*)  It turned out that the electric company records did show the air conditioner may have failed.

After the charges were dismissed, Arpaio issued another press release and posted a video statement online.  (Doc. 113, ¶ 84; Doc. 121, ¶ 84.)  In the video message Arpaio stated, "I anticipate the charges will be re-filed regarding the facts that we obtained doing

our investigation" and that the "criminal justice system, I feel, will prevail and justice will be done." (Doc. 113, ¶ 84; Doc. 121, ¶ 84.) In accordance with the County Attorney's explanation of why he dismissed the charges, no further charges have been brought against the Flakes. Trombi has since stated in deposition testimony that she believes Austin and Logan did not purposely or intentionally harm any of the dogs and that they were not responsible for the kennel's poor ventilation. (Doc. 113, ¶¶ 85, 87; Doc. 121, ¶¶ 85, 87.)

The Flakes filed this action on June 19, 2015, naming Arpaio, Trombi, and Maricopa County as defendants. (Doc. 1.) The third amended complaint raises claims of malicious prosecution, defamation, false light invasion of privacy, and First Amendment retaliation. (Doc. 101.) Defendants move for summary judgment on all counts. The Flakes themselves seek summary judgment against the defense of qualified immunity and on lack of probable cause.

## II.  LEGAL STANDARD

A motion for summary judgment tests whether the opposing party has sufficient evidence to merit a trial. Summary judgment should be granted if the evidence reveals no genuine dispute about any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A material fact is one that might affect the outcome of the action under the governing law, and a factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The movant has the burden of showing the absence of genuine disputes of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). However, once the movant shows an absence of evidence to support the nonmoving party's case, the burden shifts to the party resisting the motion. The party opposing summary judgment must then "set forth specific facts showing that there is a genuine issue for trial" and may not rest upon the pleadings. *Anderson*, 477 U.S. at 256. If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact, the court may

consider the fact undisputed for purposes of the motion. Fed. R. Civ. P. 56(e)(2). The Court must view the evidence in the light most favorable to the nonmoving party, must not weigh the evidence or assess its credibility, and must draw all justifiable inferences in favor of the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 255.

## III.  ANALYSIS

### A. Malicious Prosecution

Defendants first seek summary judgment on the Flakes' claims of malicious prosecution, which the Flakes bring against Arpaio under both federal and state law and against Trombi under federal law only. (Doc. 101 at 9.)

Under Arizona law, the tort of malicious prosecution requires proof of "(1) a criminal prosecution, (2) that terminates in favor of the plaintiff, (3) with the defendants as prosecutors, (4) actuated by malice, (5) without probable cause, and (6) causing damages." *Slade v. City of Phoenix*, 112 Ariz. 298, 300, 541 P.2d 550, 552 (1975). A plaintiff may also bring a malicious prosecution action under 42 U.S.C. § 1983. Under that federal provision, the plaintiff must make out all elements of the state law cause of action and also show that the defendant pursued the prosecution "'for the purpose of denying [the plaintiff] equal protection or another specific constitutional right.'" *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1066 (9th Cir. 2004) (quoting *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1189 (9th Cir. 1995)).

### 1.  Independent Judgment Presumption

Defendants first argue that summary judgment should be granted because the Flakes have not overcome the "independent judgment presumption." In malicious prosecution cases, federal law recognizes a rebuttable presumption that "the prosecutor filing the complaint exercised independent judgment in determining that probable cause for an accused's arrest exists at that time," thereby absolving from liability any law enforcement officers who may have aided pre-indictment. *Newman v. Cty. of Orange*, 457 F.3d 991, 993 (9th Cir. 2006) (citing *Smiddy v. Varney*, 665 F.2d 261, 266 (9th Cir.

1981)).  The plaintiff bears the burden of production to rebut the presumption.  *Newman*, 457 F.3d at 993.

Even where a prosecutor charged the plaintiff based solely on an officer's report, the plaintiff must do more than simply provide his own contradictory account of events. *Id*. at 994-95 (citing *Sloman v. Tadlock*, 21 F.3d 1462, 1474 (9th Cir. 1994)).  *See, e.g.*, *Harper v. City of Los Angeles*, 533 F.3d 1010, 1027-28 (9th Cir. 2008) (presumption overcome where unrebutted trial testimony revealed prosecutor worked "hand-in-hand" with investigating officers, officers' "ongoing daily interactions" with prosecutors led to plaintiff's arrest, and "substantial evidence" showed officers "failed to turn over evidence" and "hounded" prosecutors to file charges); *Barlow v. Ground*, 943 F.2d 1132 (9th Cir. 1991) (presumption overcome on summary judgment where an independent witness corroborated plaintiff's account calling police report into question); *Borunda v. Richmond*, 885 F.2d 1384, 1390 (9th Cir. 1988) (presumption overcome where plaintiff pointed both to "striking omissions" in police report and to the fact "that the officers themselves offered conflicting stories"); *Smiddy*, 665 F.2d at 266 (holding that presumption is overcome by "a showing that the district attorney was pressured or caused by the investigating officers to act contrary to his independent judgment" or "the presentation by the officers to the district attorney of information known by them to be false.").  *Cf. Westwood v. City of Hermiston*, 787 F. Supp. 2d 1174, 1205-06 (D. Or. 2011) (presumption not overcome where prosecutor testified he "independently made the decision to charge" plaintiff and plaintiff failed to "point to any evidence" that officers "exerted pressure on [the prosecutor], knowingly provided misinformation to him, or concealed exculpatory evidence").

Defendants here argue that the record contains insufficient evidence to overcome the independent judgment presumption.  (Doc. 107 at 5.)  That presumption, however, exists only under federal law, and Defendants cite no Arizona authority holding that it applies also to malicious prosecution claims under state law.  For a finding of liability here, state law would still require that Defendants' tortious conduct, as opposed to an

independent decision by prosecutors, caused the Flakes to be charged with animal cruelty. *See, e.g.*, *City of Douglas v. Burden*, 24 Ariz. 95, 101-02, 206 P. 1085, 1087 (1922) (chain of causation sufficient for proximate causation "is broken when a new or subsequent cause intervenes so as to become the sole factor producing the injurious result"). But it is unclear whether Arizona law imposes a *presumption* that prosecutors acted independently or simply leaves intact the plaintiff's usual burden of proof.

Either way the record here shows a disputed question of fact. As discussed below, Arpaio issued multiple statements to the press about the investigation, culminating in a twenty-two-minute press conference publicly recommending that prosecutors charge the Flakes with animal cruelty. (Doc. 113, ¶ 56; Doc. 121, ¶ 56.) One month later, the County Attorney's Office convened a grand jury to do just that. Yet two months after charging the Flakes, prosecutors dropped the charges because they "did not take into account" that the air conditioning might have malfunctioned. A jury could reasonably infer from this that prosecutors brought charges because of the pressure from Arpaio and the representations he and his office made about the investigation.

Additionally, the Flakes point to supposed discrepancies between Trombi's grand jury testimony and her deposition testimony that they say amount to circumstantial evidence that she either lied to or materially misled the prosecutors. (Doc. 114 at 4-5.) But no reasonable finder of fact could conclude Trombi did either of those. At most the evidence in the record shows she misunderstood the law of animal cruelty but pursued charges against the Flakes in good faith. It is not inferable that she knew what she said was false as opposed to mistaken or incomplete. But mistaken or incomplete testimony does not support an inference of a knowing falsehood. There is no evidence suggesting she exhibited an improper motive that interfered with the prosecutors' decision. As a matter of law, on the record here only Arpaio could have exerted improper influence over the County Attorney's Office.

As Defendants correctly point out, Trombi did provide the County Attorney's Office with her entire case file, "including the Salt River Project records of electrical

usage." (Doc. 108, ¶¶ 20-21; Doc. 113, ¶¶ 20-21.) But a rational factfinder could still conclude that even though prosecutors had the 2,000 page case file, they relied on Trombi's inaccurate (but good-faith) characterization of its contents instead of searching themselves because of the pressure imposed by Arpaio to bring charges. A factfinder could thus reasonably find that the prosecutors initially charged the Flakes based on pressure from Arpaio.

Defendants also point out that Shawn Steinberg, the prosecutor who presented the case to the grand jury, affirms that she reviewed the complete file and chose to bring the case without being coerced or misled. (Doc. 108, ¶ 23; Doc. 108-9 at 2.) But that simply raises a factual dispute that cannot be resolved on summary judgment. A rational trier of fact could reach a conclusion either way in light of the evidence. That is enough to defeat the independent judgment presumption on summary judgment.

### 2. Substantive Tort

Defendants next argue the Flakes cannot show either that prosecutors lacked probable cause or that Trombi and Arpaio pursued charges with malicious intent. (Doc. 107 at 7.) The Flakes seek summary judgment in their own favor that there was no probable cause. (Doc. 114 at 10.)

#### a. Probable Cause

"In the context of malicious prosecution, probable cause is defined as 'a reasonable ground of suspicion, supported by circumstances sufficient to warrant an ordinarily prudent man in believing the accused is guilty of the offense.'" *Gonzales v. City of Phoenix*, 203 Ariz. 152, 155, 52 P.3d 184, 187 (2002) (quoting *McClinton v. Rice*, 76 Ariz. 358, 367, 265 P.2d 425, 431 (1953)).

The County Attorney's Office charged the Flakes with "intentionally or knowingly" subjecting all the dogs "to cruel neglect or abandonment."[4] (Doc. 113-7 at

---

[4] Prosecutors also charged them with six misdemeanor counts of "intentionally, knowingly, or recklessly . . . fail[ing] to provide necessary medical attention" to several of the dogs. (Doc. 113-7 at 58-59.) *See* A.R.S. § 13-2910(A)(2). The Flakes are not pursuing claims here for the misdemeanor counts. (Doc. 130 at 3 n.1.) Additionally, for the first time in their Reply and Response to the Flakes' cross-motion for summary

49-58.) *See* A.R.S. § 13-2910(A)(8). Arizona's criminal code defines "knowingly" as awareness or belief "that the person's conduct is of that nature [specified in an offense] or that the circumstance exists." A.R.S. § 13-105(10)(b). It defines "intentionally" as, "with respect to a result or to conduct described by a statute defining an offense, that a person's objective is to cause that result or to engage in that conduct." A.R.S. § 13-105(10)(a). And "cruel neglect" is defined as "fail[ing] to provide an animal with necessary food, water or shelter." A.R.S. § 13-2910(H)(3). As a matter of law there was no probable cause to charge the Flakes with felony animal cruelty.

For five days while the Flakes were housesitting before the night in question, the dogs stayed in the kennel space with no issues. That left the Flakes with no reason to suspect the conditions were inadequate. (Doc. 113, ¶ 48; Doc. 121, ¶ 48.) The Hugheses had long operated the kennel out of the same space without any incident of a sick or dead dog. (Doc. 113, ¶ 52; Doc. 121, ¶ 52.) Defendants have pointed to no evidence reasonably indicating that the Flakes actually intended to deprive the dogs of necessary food, water or shelter. Nor is there evidence that they knew their actions would produce such a result. Defendants instead rely on statements by experts who assisted with the Sheriff's Office investigation. Bernard Mangone, a veterinarian, described the deaths as "wholly preventable," noted the dogs were placed in "overcrowded conditions," and concluded that "[n]o reasonable or prudent individual would deem it reasonable to house that number of dogs in a room of the measured size." (Doc. 107 at 7.) Defendants also quote a professor of veterinary medicine as calling the kennel's condition "unacceptable" and the airflow and temperature "not adequate." (Doc. 107 at 8.)

Nothing the veterinarians said addresses what the Flakes knew or intended. The police and prosecutors may not delegate their charge to veterinarians. The veterinarians gave their observations but did not know the standard for felony animal cruelty, and what

---

judgment, Defendants raise an argument that probable cause existed as to A.R.S. § 13-2910(A)(1) as a lesser included offense of A.R.S. § 13-2910(A)(8). (Doc. 127 at 18.) The Flakes were not charged under the former statute. The Court accordingly need not consider it.

they observed fell utterly short of that. It was for the police officers, not the veterinarians, to know that. No reasonable person could have concluded from those opinions or from anything else that Austin or Logan "knowingly or intentionally" subjected the dogs "to cruel neglect or abandonment." At most, it might suggest the Flakes were negligent, which is not a felony in this state. For probable cause to have existed, there must have been evidence that the Flakes either intended to subject the dogs to cruel neglect or knew they were doing so. It is not enough that the Flakes intentionally did acts the Hugheses had done for two years without any other incident as reflected on the record here. They had to do it with intent or knowledge that it was cruelty. The record contains no evidence they did.

### b. Malice

"Malice" means an "improper motive." *Nataros v. Superior Court of Maricopa Cty.*, 113 Ariz. 498, 500, 557 P.2d 1055, 1057 n.1 (1976). The question is whether the defendant sought out criminal proceedings "primarily for a purpose other than that of securing the adjudication of the claim on which the proceedings are based." *Visco v. First Nat'l Bank of Ariz.*, 3 Ariz. App. 504, 507, 415 P.2d 902, 905 (Ct. App. 1966); *see also* Restatement (Second) of Torts, § 653 (1977) (liability for malicious prosecution exists where defendant "initiates or procures [criminal] proceedings without probable cause and primarily for a purpose other than that of bringing an offender to justice").

### i. Trombi

As discussed above, a finder of fact could not reasonably conclude that Trombi knew she was conveying false information to the grand jury and to prosecutors. Moreover, the Flakes have sued Trombi for malicious prosecution only under federal law (Doc. 101 at 9), which requires a showing that she sought charges specifically "for the purpose of denying [the Flakes] equal protection or another specific constitutional right." *Awabdy*, 368 F.3d at 1066 (internal quotation marks omitted). There is no evidence that she acted for the specific purpose of denying the Flakes a federal right.

Trombi is entitled to summary judgment against the claim of malicious

prosecution for the purpose of denying the Flakes federal rights under section 1983.

### ii. Arpaio

The Flakes allege malicious prosecution against Arpaio under both state and federal law. (Doc. 101 at 9.) The federal claim against him suffers the same defects as the claim against Trombi: the Flakes have offered no evidence he sought to deprive them of a specific constitutional right. The state law claim, however, does not have that requirement. The Flakes must only show that Arpaio sought charges with malice (i.e., for an improper purpose) and without probable cause. *See Slade*, 112 Ariz. at 300, 541 P.2d at 552.

It is readily inferable that Arpaio reached out to prosecute the Flakes for the primary improper purpose of garnering publicity. Arpaio issued repeated press releases and held several press conferences drawing a striking level of public attention to the incident. (Doc. 114 at 11.) The first press release on June 23, 2014, touted him as "aggressive" on animal cruelty. (Doc. 113-6 at 87-88.) It enhanced the publicity that Flake was the son of Senator Jeff Flake. A finder of fact could reasonably infer that Arpaio sought charges against the Flakes primarily to gain publicity and bolster his own public image rather than to bring them to justice for actual wrongdoing. That suffices under state law for a triable issue of fact as to whether he pursued the prosecution for a non-legitimate purpose. Of course, Arpaio could do that and get away with it as long as he had the cover of probable cause. But without it, Arpaio's actual motivation leaves him open to liability.

Arpaio is therefore entitled to summary judgment on the federal malicious prosecution claim, but not on the state claim.

### B. Defamation

Defendants next seek summary judgment on the Flakes' claims of defamation, raised under federal and state law against both Arpaio and Maricopa County. The defamation claims arise from statements in the June 23, 2014 press release and statements Arpaio made in his September 9, 2014 press conference.

### 1. Statute of Limitations

Defendants first challenge the state-law defamation claims as barred by the one-year statute of limitations for actions against public entities and employees. (Doc. 107 at 13.)  *See* A.R.S. § 12-821.  A defamation action accrues, and the statute of limitation begins to run, upon publication of the defamatory statement.  *Lim v. Superior Court in and for Pima Cty.*, 126 Ariz. 481, 482, 616 P.2d 941, 942 (Ct. App. 1980).  However, an otherwise time-barred claim may proceed if it "relates back" to the original pleading.  *Boatman v. Samaritan Health Services, Inc.*, 168 Ariz. 207, 213, 812 P.2d 1025, 1031 (1990).  Claims "relate back" if they arise "out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading."  Fed. R. Civ. P. 15(c)(1)(B).

The Flakes' initial complaint, filed on June 19, 2015, alleged malicious prosecution and abuse of process.  They did not include defamation until their first amended complaint, filed on January 15, 2016.  (Doc. 40.)  But their initial complaint pointed to statements from the June 23, 2014 press release and the September 9, 2014 press conference that together form the core of the defamation claims here.  *See* Doc. 1 at 5-7.  The defamation claims therefore arise out of the same transactions or occurrences as the original complaint and are not time-barred.

### 2. Substantive Claim

Defendants argue that the statements are not defamatory.  To be liable for defamation of a private person under Arizona law, a defendant must make a false defamatory statement and either know, recklessly disregard, or negligently fail to ascertain that it is false.  *Peagler v. Phoenix Newspapers, Inc.*, 114 Ariz. 309, 315, 560 P.2d 1216, 1222 (1977) (citing Restatement (Second) of Torts § 580B (1975)).  The false statement "must bring the defamed person into disrepute, contempt, or ridicule, or must impeach [the person's] honesty, integrity, virtue, or reputation."  *Godbehere v. Phoenix Newspapers, Inc.*, 162 Ariz. 335, 341, 783 P.2d 781, 787 (1989).

To meet the First Amendment's constitutional minimum, "a statement on matters

of public concern must be provable as false before there can be liability under state defamation law." *Turner v. Devlin*, 174 Ariz. 201, 206, 848 P.2d 286, 291 (1993) (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19-20 (1990)). The words used "must be capable of being reasonably interpreted as stating actual facts about" the plaintiff. *Turner*, 174 Ariz. at 207, 848 P.2d at 292. Statements of opinion may still be actionable "when they 'imply a false assertion of fact.'" *Id.* at 208, 848 P.2d at 293 (quoting *Milkovich*, 497 U.S. at 18-19).

Additionally, to be actionable as a federal claim under section 1983, a plaintiff must make a showing of "defamation-plus," i.e., that the defendant's defamatory statement also caused an "injury to a recognizable property or liberty interest." *Crowe v. Cty. of San Diego*, 608 F.3d 406, 444 (9th Cir. 2010). The plaintiff can either "(1) allege that the injury to reputation was inflicted in connection with a federally protected right; or (2) allege that the injury to reputation caused the denial of a federally protected right." *Id.* (citing *Herb Hallman Chevrolet v. Nash-Holmes*, 169 F.3d 636, 645 (9th Cir. 1999)).

The Flakes point to two groups of statements they say were defamatory: (1) statements made in the June 23, 2014 press release, and (2) statements Arpaio made during the September 9, 2014 press conference. (Doc. 114 at 13-14; Doc. 101, ¶¶ 34, 61.) (In their response to Defendants' motion for summary judgment, the Flakes point to a third statement allegedly made in a separate July 9, 2014 press release. *See* Doc. 114 at 13-14. However, that press release is not mentioned in the complaint or anywhere else until the Flake's response brief to this motion. Accordingly, it will not be considered here.) The statements will be analyzed under state and federal law in turn.

### a. State Law

#### i. Press Release

The Flakes point to the following portion of the June 23, 2014 press release as defamatory:

> "Owners claim the air conditioning was cut off after a dog chewed through some electrical wiring," Arpaio says. "But *it seems unreasonable*

[that] dogs could be healthy at 11 PM at night and dead by 5:30 am the next morning as the owners suggest. Even the veterinarian I met with today agrees that the timeline given by the owners and caretakers is *highly suspect*.["]

[. . . .]

Jesse and Malesia Hughes who have operated the pet boarding business for two years were out of the state when the dogs died. *The animals were being overseen by [their] relatives, Logan and Austin Flake.*

(Doc. 114 at 13 (emphasis in plaintiffs' brief).)

The Flakes contend that Arpaio "falsely suggested that the Flakes were lying in order to conceal their misconduct in reference to the deaths of the dogs." (*Id.*) However, the Flakes also concede that the press release "does not identify Logan and Austin Flake (or any other person) by name as wrongdoers." (Doc. 108, ¶ 26; Doc. 113, ¶ 26.) For that reason alone the statement is not defamatory.

In any event, the statements are not actionable as defamation. Arpaio first said that "it seems unreasonable" the dogs could have declined so rapidly overnight "as the owners suggest." That may be equivalent to saying, "Their story does not make sense," or, "I don't believe their story." But both of those are opinions, not assertions of fact "provable as false." *Turner*, 174 Ariz. at 206, 848 P.2d at 291. The same is true of Arpaio's subsequent statement that a veterinarian agreed with him that the Flakes' purported timeline was "highly suspect." The Flakes have not alleged that the veterinarian did not in fact speak with Arpaio and agree with him. Nothing else about that statement is provable as false.

Statements of opinion can still be defamatory if they imply provably false assertions of fact. *Turner*, 174 Ariz. at 208, 848 P.2d at 293. The quoted statements do not. Moreover, as a constitutional minimum, "where a statement of 'opinion' . . . reasonably implies false and defamatory facts regarding . . . a private figure on a matter of public concern, a plaintiff must show that the false connotations were made with some

level of fault . . . ." *Milkovich*, 497 U.S. at 20; *see also Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 347 (1974) (holding that states may set standards for defamation liability "so long as they do not impose liability without fault"). The Flakes have not shown any level of fault on the record here.

*Turner* illustrates how the statements Arpaio made skirt the boundaries of defamation. There a school nurse made a number of public statements about a police officer's interview with a student. *Turner*, 174 Ariz. at 209, 848 P.2d at 294. The nurse said that the officer "demanded that the student stand against the wall," that the student was "interrogated," that the officer acted in a "rude and disrespectful fashion," that his "manner bordered on police brutality," and that he engaged in "outdated, uneducated behavior." *Id.* at 209-10, 848 P.2d at 294-95. The court rejected the officer's contention that these statements were false accusations of misconduct. To ascertain whether the officer "demanded or requested the child to stand, whether his inquiry was more like a criminal interrogation rather than questioning, whether his manner was rude, disrespectful, outdated, and uneducated as opposed to something less offensive all lie beyond the realm of factual ascertainment or proof." *Id.* at 207, 848 P.2d at 292. There, words such as "manner," "as if," and "bordered" showed "that the characterizations were not meant to be precise." *Id.* at 208, 848 P.2d at 293. Here, too, Arpaio used tentative language. He said that the story "seems unreasonable" and that he and a veterinarian agree it is "highly suspect." His statements in the press release do not amount to actionable defamation.

### ii. Press Conference

Next, the Flakes point to Arpaio's statements at the September 9, 2014 press conference as defamatory. They argue:

> Arpaio falsely claimed he had "proper evidence" that Austin and Logan deprived 25 dogs of "food, water and shelter" and thereby caused their deaths. He also falsely claimed that their explanation for the deaths did not pass the "smell test," which indicates that they are liars. Finally, Arpaio also falsely accused Austin and Logan of engaging in a criminal

conspiracy.

(Doc. 114 at 14-15.)

For starters, there is no evidence that Arpaio accused them of taking part in a conspiracy. Additionally, Arpaio's statement that their explanation did not pass the "smell test" is not actionable because it is not a factual statement "provable as false." *Turner*, 174 Ariz. at 206, 848 P.2d at 291. Finally, a more complete version of the first statement they point to reads as follows:

> So we finally completed the investigation. We turned it over to the County Attorney for review and don't forget that they had to make sure they had the proper information and evidence to prosecute. So we're recommending to the County Attorney that 21 felony charges be pursued against the four suspects in this investigation. The four targets that we started out with and I am sure that that office will review the evidence and we'll see what happens.

> I'm very confident that we have the proper evidence. And, once again, the County Attorney's Office will review our evidence. We're recommending 21 felony charges, several misdemeanor charges. . . .

(Doc. 61-1 at 5.)

Arpaio's statement "I'm very confident that we have the proper evidence" refers back to his statement about "the proper information and evidence to prosecute." That does not assert that the Flakes were guilty. In the first place, it is a statement of confidence and opinion, not purported fact. The surrounding statements reiterated (earnestly or not) that the County Attorney's Office would have to review the evidence before deciding whether or not to charge anyone. That is not to say one can always avoid liability by prefacing a statement of guilt with "I'm very confident." *Cf. Cianci v. New York Times Pub. Co.*, 639 F.2d 54, 64 (2d Cir. 1980) (Friendly, J.) ("It would be destructive of the law of libel if a writer could escape liability for accusations of crime simply by using, explicitly or implicitly, the words 'I think.'"). But this was only a

statement "that we have the proper evidence," not that the Flakes are guilty.

Second, and related, it is unclear the "proper evidence" meant proper evidence to prosecute. It could have meant evidence sufficient to indict, which would be evidence of probable cause, and not evidence sufficient to convict, which would be evidence beyond a reasonable doubt. It turned out there was not even evidence sufficient to indict, but Arpaio qualified what he said as a statement of confidence, not of fact. His ambiguous statement of confidence is not provably false and is therefore not actionable defamation.

### b. Federal Law

Because "defamation-plus" under section 1983 requires a showing of a constitutional violation on top of all defamation's state law elements, the statements the Flakes have identified all fall short.

The Flakes point to *Gobel v. Maricopa Cty.*, 867 F.2d 1201 (9th Cir. 1989), *abrogated by Merritt v. Cty. of Los Angeles*, 875 F.2d 765, 769 (9th Cir. 1989), for the proposition that "a prosecutor's false accusations of criminal misconduct 'made in connection with [an] illegal arrest' constitute 'the kind of defamation plus [sic] injury necessary to state a cognizable section 1983 claim.'" (Doc. 114 at 15 (quoting *Gobel*, 867 F. 2d at 1205).) The Flakes were not arrested. (Doc. 108, ¶ 19; Doc. 113, ¶ 19.) They point to no specific constitutional injury they suffered from Arpaio's statement. Arpaio and Maricopa County are entitled to summary judgment on all defamation claims, federal and state.

### C. False Light Invasion of Privacy and First Amendment Retaliation

Defendants next seek summary judgment on the Flakes' false light invasion of privacy claim as time-barred. Though the Flakes raised it in their complaint, they did not defend the claim in their briefing on this motion. A party forfeits a claim it failed to raise in response to a summary judgment motion. *See Jenkins v. Cty. of Riverside*, 398 F.3d 1093, 1095 n.4 (9th Cir. 2005) (deeming claims "abandoned" that were not raised in opposition to summary judgment motion); *Doe v. Dickenson*, 615 F. Supp. 2d 1002, 1010 (D. Ariz. 2009) (plaintiff's failure to respond to defendant's arguments rendered

applicable claims waived).  The Flakes have abandoned their false light claim.  Summary judgment will be granted for Defendants as to those claims.  The Flakes have also abandoned their First Amendment retaliation claim because they did not respond to Defendants' Motion for Summary Judgment on that issue, either.

### D. Qualified Immunity

Defendants also seek summary judgment based on qualified immunity.

Under federal law, public officials are entitled to qualified immunity "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  A right is "clearly established" where "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Lacey v. Maricopa Cty.*, 693 F.3d 896, 915 (9th Cir. 2012) (citing *Saucier v. Katz*, 533 U.S. 194, 202 (2001)).  The right violated must have been "clearly established in light of the specific context of the case" at hand. *Mattos v. Agarano*, 661 F.3d 433, 440 (9th Cir. 2011) (en banc).  There need not be "a case directly on point," but "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* at 442.  The federal claims here fail for lack of violation of a federal right in the first place.  It is not necessary to inquire into qualified immunity.

Police officers have a similar qualified immunity from individual liability under Arizona law.  *Portonova v. Wilkinson*, 128 Ariz. 501, 503, 627 P.2d 232, 234 (1981).  This holds except where the officer "knew or should have known that he was acting in violation of established law or acted in reckless disregard of whether his activities would deprive another person of their rights." *Chamberlain v. Mathis*, 151 Ariz. 551, 558, 729 P.2d 905, 912 (1986).

The only surviving state law claims are for malicious prosecution against Arpaio.  The analysis is similar to the federal law qualified immunity analysis, except that the Court must also inquire into Arpaio's state of mind.  The question is whether Arpaio

"knew or should have known that he was acting in violation of established law or acted in reckless disregard of whether his activities would deprive another person of their rights." *Chamberlain*, 151 Ariz. at 558, 729 P.2d at 912. The salient facts here are disputed. A reasonable factfinder could conclude that Arpaio pursued charges against the Flakes for the primary purpose of garnering publicity. Arpaio and any law enforcement officer had to have known that is not a proper purpose of criminal prosecution. That is enough to render summary judgment inappropriate.

**IV.    SUMMARY**

Defendants' motion for summary judgment is denied as to the state law malicious prosecution claims against Arpaio and Maricopa County. As a matter of law, prosecutors did not have probable cause to charge the Flakes with animal cruelty, and summary judgment is granted for the Flakes on this point. It is for a trier of fact to decide whether Arpaio exhibited malice in seeking charges against the Flakes; if so, whether the independent judgment presumption insulates him from liability; and whether he is protected from suit by qualified immunity under Arizona law. For the remainder of the claims and issues, summary judgment is granted in favor of Defendants and against the Flakes.

IT IS THEREFORE ORDERED that Defendant's Motion for Summary Judgment (Doc. 107) is granted in part and denied in part as summarized in the preceding paragraph.

IT IS FURTHER ORDERED that the Flakes' motion for partial summary judgment (Doc. 114) is granted that there was no probable cause for the charges but is otherwise denied.

/ / /

/ / /

/ / /

IT IS FURTHER ORDERED that summary judgment is granted in favor of Defendant Marie Trombi and against Plaintiffs.

Dated this 31st day of August, 2017.

_____
Neil V. Wake
Senior United States District Judge