1   Jeffrey S. Leonard (SBN 003809)
    Jeffrey.Leonard@SacksTierney.com
2   Evan F. Hiller (SBN 028214)
    Evan.Hiller@SacksTierney.com
3   SACKS TIERNEY P.A.
    4250 N. Drinkwater Blvd., 4th Floor
4   Scottsdale, AZ 85251-3693
    Telephone:  480.425.2600
5   Attorneys for Defendants

6

7                   IN THE UNITED STATES DISTRICT COURT

8                     FOR THE DISTRICT OF ARIZONA

9

10  Austin Flake and Logan Flake,              No. CV-15-01132-PHX-NVW
                         Plaintiffs,
11                                             **MOTION FOR RECONSIDERATION**
              v.
12  Joseph Michael Arpaio; et al.,
                         Defendants.
13

14          Pursuant to LRCiv 7.2(g), Defendants move the Court to reconsider its order

15  prohibiting Defendants from calling Dr. Nancy Bradley, a veterinarian, as an expert

16  witness.  In so ruling, the Court stated that Dr. Bradley's testimony would be prohibited

17  because MCSO did not rely on her opinions in making its submittal to the Maricopa

18  County Attorney's Office.[1]

19          In examining Deputy Marie Trombi, Plaintiffs have suggested both that Dr. Bernard

20  Mangone's conclusions should be discounted because (1) he performed services on MCSO

21  investigations on a number of occasions, and (2) his "math" is suspect because it did not

22  take into account the fact that certain dogs may have been in cages on shelves rather than

23  on the floor of the 9 foot by 12 foot "dog room."

24

25  _____

    [1] Dr. Bradley's report, a copy of which is annexed to this motion as Exhibit A, was
26  disclosed to Plaintiffs with Defendants' other expert disclosures on August 26, 2016 (See
    Notice of Service at Doc. 99), and was relied on in Defendants' Motion for Summary
27  Judgment (see Statement of Facts in Support of Defendants' Motion for Summary
    Judgment (Doc. 108), at ¶ 13).  No motion challenging her testimony was filed, by the
28  deadline of January 27, 2017 (Doc. 58) or subsequently.

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3693

Dr. Bradley's review supports Dr. Mangone's conclusions that the dogs were provided inadequate space. Dr. Bradley supports that conclusion with specific data on accepted and acceptable space requirements, notes that for confinement for more than a few hours, "additional space should be available to ensure the animal does not lay or stand in its own excrement," and discusses the accepted practice that dogs "should be housed individually unless with a known companion or prior behavior evaluation of both dogs to ensure compatibility." She states that "[t]his many dogs in a confined space for a prolonged period of time would lead to a great deal of anxiety for each individual dog," and that "[t]here could even be the potential for fighting and harming one another." She concludes that "this many dogs in the allotted space . . . and without water is unacceptable, regardless of how many times it may have occurred previously without the dogs dying."

It is likely that Plaintiffs will argue to the jury that Dr. Mangone's conclusions should be discounted or disregarded. Defendants should be permitted to present to the jury independent testimony that he was right.

For that reason, Defendants request that the Court reconsider its decision to exclude Dr. Bradley's testimony.

DATED December 11, 2017.                     SACKS TIERNEY P.A.

*s/Jeffrey S. Leonard*
Jeffrey S. Leonard
Evan F. Hiller
Attorneys for Defendants

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3693

1982570.v1

1    <u>CERTIFICATE OF SERVICE</u>

2         I hereby certify that on December 11, 2017, I electronically transmitted the

3    foregoing document to the Clerk's Office using the CM/ECF System for filing and

4    transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

5                              Stephen Montoya
                              Richard Trujillo
6                              MONTOYA, LUCERO & PASTOR, P.A.
                              The Great American Tower
7                              3200 North Central Avenue, Suite 2550
                              Phoenix, AZ  85012
8                              *Attorneys for Plaintiffs*

9    *s/ Mary Chapa*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3693

1982570.v1

# EXHIBIT A

Expert Report of Nancy Bradley DVM, MNM

*Flake v. Arpaio*, CV15-01132-PHX-NVM (D. Ariz.)

Prepared for

Sacks Tierney P.A. Attorneys

August 26, 2016

MCSO_003379

**Background & Qualifications**

My name is Dr. Nancy Bradley. I have been a shelter veterinarian where I have been involved in animal cruelty investigations, either directly or indirectly on an advisory basis, for over 15 years. I am currently employed as an Assistant Professor of Shelter Medicine at a local veterinary college where I also teach veterinary forensics and continue to consult and testify as an expert witness in animal abuse cases. My professional background and experiences are set forth more fully in Exhibits A and B.

**Materials Considered**

I have previously reviewed investigative material provided to me by the Maricopa County Attorney's Office in connection with Maricopa County Sheriff's Department investigation DR#14-014274. Those materials consisted of police reports, medical/necropsy records, and other evidence amassed by the Maricopa County Sheriff's Department. I have also reviewed a transcript of deposition testimony by the civil plaintiff, Austin Flake, which was provided to me. A full list of documents that I have reviewed is attached as Exhibit C.

**Compensation**

I have been asked to consult for the Defendants in this civil case, No. CV15-01132-PHX-NVW. I am being compensated for my services at an hourly rate of $250. My compensation does not depend on reaching particular opinions nor upon the result of the civil case.

**Scope of Opinions**

The issues that arise after review of the information provided involve:

1. How the animals were housed, specifically in regards to the sheer number of dogs in the specified space and the absence of water within that space;

2. How the dogs died and why; and

3. A lack of professional veterinary guidance or care when the situation came to light.

It is my understanding that roughly 28 dogs of various sizes, ages, and conditions were housed in a room with dimensions 9ft x 12ft for an extensive period of time. Twenty-one dogs perished. Apparently some dogs were confined in individual kennels/cages within this area. In addition, when animals were placed in the room some dogs, not in kennels, would jump on shelves on the wall to be able to lay down, according to the transcript information provided. Regardless, this would be an inappropriate amount of space to enclose this many dogs together for a prolonged period of time.

1

MCSO_003380

**Inadequate Housing and Water**

The dogs in this group ranged from very large breeds such as a Great Dane to very small breeds. A 9ft x 12ft room (108 square feet) floor space, would not even meet minimum requirements for 28 dogs of these varying sizes.

According to transcript statements, the animals were confined in this space together the majority of the time throughout a 24 hour period. The dogs were let out intermittently during the day and at those times water was offered. The dogs were feed once per day, in the morning, this would have been adequate given that most of the dogs were at or near adult age, according to the records. However, the infrequent access to water and continued confinement was not conducive to a stress free environment. During the heat of the summer animals should have direct access to water. It would be difficult at best to insure that each individual dog among 28 different dogs received adequate amounts of water or even drank when the opportunity was provided, before being placed back into the confined space.

There are many recommendations in the literature regarding proper housing/kenneling for specific sizes and breeds of dogs. Across the board, consistent recommendations for shelters and boarding facilities are that dogs should be housed individually unless with a known companion or prior behavior evaluation of both dogs to ensure compatibility. Additionally, at a minimum, enough space must be provided for the animal to stand up and turn around within the enclosure according to the Animal Welfare Act. For longer periods of confinement (more than just a few hours), additional space should be available to ensure the animal does not lay or stand in its own excrement. As an example of minimum space requirements according to the Animal Welfare Act Regulations, a Dalmatian measuring 31 inches long from the nose to the base of the tail would require a minimum of 9.5 square feet (minimum floor space). In a group housing situation such as this, the total floor space for animals must meet or exceed each dog's individual minimum space requirement added together.

This many dogs in a confined space for a prolonged period of time would lead to a great deal of anxiety for each individual dog, especially when unfamiliar with one another. There would be limited space for the issues previously discussed. There could even be the potential for fighting and harming one another. If the animals have not been feed  or adequately hydrated prior to entering this environment (to minimize or decrease excrement/mess) and not provided, at minimum, water during said confinement, then the stage is set for disaster.

**Cause of Death of the Dogs**

When large numbers of animals are confined together ventilation (airflow) and temperature regulation are critical. I reviewed the reports provided discussing the condition of the airflow into the 9ft x 12ft room in question. The condition of the filters and the lack of maintenance of the existing air conditioning potentially affected both of these issues. The way the room is described, i.e. tightly sealed at the three entry points and the limited airflow, suffocation would

MCSO_003381

be a concern as a contributing factor if airflow was completely eliminated. The necropsy reports did not illustrate consistent signs of suffocation. There was no conclusive evidence that air did not flow into the room. The next concern was temperature, even with diminished or adequate airflow. If cool air did not continue to enter this confined space, especially given the time of year and external temperatures, with this large number of dogs in such a confined space, temperature would be a critical component for survival.

According to the information provided the temperature that night was 73 degrees. In a confined space and with this many animals the room would become very hot in a short amount of time. This would be similar to a dog confined in a car. Even with the windows slightly down, without cool air flow the animal can suffer from heatstroke.

Dogs cool themselves by panting and then inhalation of the cool air. If an animal is anxious and stressed, also considering, decreased water intake or none provided, dehydration will begin. If the animal is no longer adequately hydrated it will decrease its ability to salivate and panting becomes ineffective as a cooling mechanism. If the temperature becomes elevated within a confined space, as an individual dog this is dangerous, but combined with a large number of other dogs, the chance of succumbing to heatstroke increases dramatically.

Necropsies were performed on many of the deceased dogs. Most of the bodies were bloated and severely autolytic. Many of the dogs did not have food in their stomach or small intestines, and did not have feces present in the large bowel. Generally it takes 12 to 24 hours for food to digest through the gastrointestinal system of a canine. This would be consistent with the dogs not being feed prior to their confinement. I would agree with Dr. Mangone that the cause of death in these animals was consistent with heatstroke. I also base this opinion on the diagnostic results and fluid therapies required in the few dogs that did survive.

## Failure to Seek Professional Veterinary Guidance or Care

In my review of the text messages, this situation first came to the knowledge of the caregiver around 5am in the morning.  According to the plaintiff transcript there were piles of deceased dogs with vomit, diarrhea, and blood present.  Also some animals that were still alive were staggering around. At least one dog appeared to be improving, but later died, within five hours.

This may have been prevented if professional guidance and assistance were obtained. The transcript indicates some surviving dogs were eliciting health issues but very much alive. The care giver continued to text individuals in another state (non-veterinarians) for instructions. The care giver in my opinion was given inadequate instructions for the care of heatstroke.  There was no attempt to obtain professional guidance. For example, a phone call to a 24 hour animal emergency clinic. There are facilities such as this throughout the Phoenix metropolitan area. Both parties should have recognized the catastrophic nature of this event as it was unfolding and sought professional veterinary assistance immediately. If at minimum a phone call to an animal emergency facility had occurred, advice would have been given or phone numbers of

3

MCSO_003382

professionals that could respond such as mobile veterinarians or some other entity. If at minimum 911 was contacted, MCSO dispatch has access to detectives with the Animal Crimes Unit who are on call to them. These detectives have phone numbers to agencies such as the Arizona Humane Society with access to EAMTs Emergency Animal Medical Technicians that could be deployed to a scene such as this.

Every animal in the caregivers' care had a boarding contract specifically authorizing the boarding facility, by the owner at their expense, to acquire veterinary care in the event of illness or emergency. According to these text records, in my opinion, there was a critical delay in providing those animals not already deceased and demonstrating compromised health issues with professional veterinary medical evaluation and care. In my opinion this resulted in deaths that may have been avoided.

<u>Conclusions</u>

In my opinion, with the information provided, I believe a series of events, many preventable, caused this terrible tragedy. First, this many dogs in the allotted space 9ft x 12ft (108 square feet), and without water, is unacceptable, regardless of how many times it may have occurred previously without the dogs dying. Second, the airflow and more importantly the temperature regulation of this space were not adequate. Although I assume that animals in similar numbers have been housed in this room before without incident, the poor condition and maintenance of the air conditioner unit was a powder keg waiting to go off.

In my opinion, I believe the number of dogs in this grossly inappropriately confined space and an elevation of temperature were the primary catalyst for this tragic event. The continued loss of life in my opinion would have been minimized, if not prevented, if immediate professional veterinary guidance and care had been sought and provided to all the surviving animals regardless of their condition, by the caregiver who had custody and control over those animals.

Respectfully submitted,

August 26, 2016

Nancy Bradley DVM, MNM

MCSO_003383

# Exhibit A

**MCSO_003384**

NANCY C. BRADLEY-SIEMENS, DVM, MNM
5715 W. Utopia Rd, Glendale, AZ, 85308, nbradl@midwestern.edu

## WORK EXPERIENCE

MIDWESTERN UNIVERSITY COLLEGE OF VETERINARY MEDICINE
5715 W. Utopia Rd, Glendale, AZ 85308
**Assistant Professor of Shelter Medicine**, 2016-Present

ARIZONA HUMANE SOCIETY
9226 N. 13th Avenue, Phoenix, AZ 85021, (602) 997-7585
**Staff Veterinarian**, 2013-Present
\* Duties include: performing high volume spays and neuters, handling emergency cases,
practicing shelter medicine, supervising health of quarantined animals, teaching animal first aid,
euthanasia techniques, and general medical topics to field, kennel, and clinical staff. Assist
valley law enforcement agencies in the medical evaluation of victims of animal cruelty,
providing professional assistance to County Attorneys and giving court testimony in animal
cruelty cases.
**Director of Medical Services**, 2007-2013; **Chief Veterinarian**, 2005-2007
\* Duties included: administrative duties; manage a staff of 8.5 veterinarians, 52 staff members
encompassing AHS's five clinics, performing high volume spays and neuters, handling
emergency cases, practicing shelter medicine, teaching animal first aid (EAMT class), euthanasia
techniques, and general medical topics to field, kennel, and clinical staff. Assist valley law
enforcement agencies in the medical evaluation of victims of animal cruelty, providing
professional veterinary forensic assistance to County Attorneys and giving court testimony in
animal cruelty cases as an expert witness. Review and write policies and procedures for shelter
medicine.

 MARICOPA COUNTY ANIMAL CARE AND CONTROL
2323 S. 35th Avenue, Phoenix, AZ 85009, (602) 506-5167
**Chief Veterinarian**, 2004-2005; **Staff Veterinarian**, 2000-2004
\* Duties included: performing high volume spays and neuters, handling emergency cases,
practicing shelter medicine, supervising health of quarantined animals, teaching animal first aid,
euthanasia techniques, and general medical topics to field, kennel, and clinical staff. Assist
valley law enforcement agencies in the medical evaluation of victims of animal cruelty,
providing professional assistance to County Attorneys and giving court testimony in animal
cruelty cases. Additional responsibilities as Chief Veterinarian include supervising two staff
veterinarians and clinic staff at two county facilities, as well as reviewing and writing policies
and procedures and advising members of the field and kennel staff and administration, and
assisting in the hiring of new staff.

EMERGENCY ANIMAL CLINIC, INC.
2260 W. Glendale Avenue, Phoenix, AZ 85021, (602) 995-3757
**Veterinarian**, 1997-2000
\* Duties included: practicing emergency medicine, to include trauma surgery and supervising the
intensive care unit; performed post-operative care for boarded surgeons; coordinated and
implemented the externship program in emergency medicine for fourth year vet students.

MCSO_003385

NANCY C. BRADLEY-SIEMENS, DVM, MNM
5715 W. Utopia Rd, Glendale, AZ, 85308, nbradl@midwestern.edu

MOUNTAIN VIEW ANIMAL HOSPITAL P.L.C.
9812 N. 7th Street, Phoenix, AZ 85020, (602) 861-1355
**Veterinarian,** 1995-1997
* Duties included: practicing general medicine as a staff veterinarian; assisted exotic animal experts; conducted inventory and purchasing of medications and surgical supplies.

GLENDALE ANIMAL HOSPITAL
6640 N.W. Grand Avenue, Glendale, AZ 85301
**Veterinarian,** 1993-1995
* Duties included: practicing general medicine as an on-call staff veterinarian; rotated working between three hospitals.

## EDUCATION

REGIS UNIVERSITY
Masters of Non-Profit Management, 1/2003 to 8/2006

COLORADO STATE UNIVERSITY
Doctor of Veterinary Medicine, 8/1989 to 5/1993

COLORADO STATE UNIVERSITY
Bachelor of Science: Major in Veterinary Science, 12/1990
(Started 8/86 at the University of Arizona)

## VETERINARY LICENSES

Arizona #3064 Issued 6/23/1993 (Active)
West Virginia #9311 Issued 6/7/1993 (Not Active)

## OTHER TRAINING

UNIVERSITY OF FLORIDA
Veterinary Forensics (Master's Program) 1/2013 to present

GLENDALE COMMUNITY COLLEGE
Law Enforcement Investigator, 3/2005 to 5/2005

GCC LAW ENFORCEMENT TRAINING ACADEMY
Police Academy, graduated 7/1994 to 5/1995

## CERTIFICATIONS, ASSOCIATIONS AND PUBLICATIONS

* Bradley-Siemens N, Brower A. Veterinary Forensics: Firearms and Investigation of Projectile Injury. *Vet. Path*. 2016 Vol 53(5) 988-1000.
* Bradley N, Rasile K. Recognition and management of animal sexual abuse. *Clinician's Brief*. 2014 April: 73-75.

2

NANCY C. BRADLEY-SIEMENS, DVM, MNM
5715 W. Utopia Rd, Glendale, AZ, 85308, nbradl@midwestern.edu

* Bradley N, Rasile K. <u>Addressing animal sexual abuse</u>. *Clinician's Brief.* 2014 April: 77
* AZPOST Certified Peace Officer (5/1995- 3/2010)
* AZPOST Certified Investigator
* Certified in Chemical Immobilization Weapons
* Member of the Association of Shelter Veterinarians
* Member of the Arizona Professionals' Animal Cruelty Taskforce (APACT)
* Member of the Arizona Veterinary Medical Association
* Member of the American Veterinary Medical Association
* Member of International Veterinary Forensic Science Association (IVFSA)
* Member of Arizona Homicide Investigators Association
* Member of American Academy of Forensic Sciences (AAFS)
* Member of Humane Link of Arizona
* Wild Land Fire Certification
* Disaster Response Training

## BOARD POSITIONS

* Board of Directors, Arizona Veterinary Medical Association 2007-2010
* Arizona Veterinary Medical Examining Board 2009-2014
     2011 AZ Delegate to American Association of Veterinary State Boards (AAVSB)
     2013 AAVSB speaker Shelter Medicine Panel Discussion
* Humane Link Board 2010-2014
* International Veterinary Forensics Association Board 2013-present
* Advisory Board Midwestern University College of Veterinary Medicine 2013-2014

## COMMUNITY ACTIVITIES (VOLUNTEER)

MARICOPA COUNTY SHERIFF'S OFFICE, ANIMAL CRUELTY UNIT
102 W. Madison Street, Phoenix, AZ 85003, (602) 876-1087
**Reserve Deputy Sheriff**, 2004-2007
* Assigned to the Animal Cruelty Unit as a certified detective responsible for assisting cruelty investigators in the investigation, and prosecution of animal cruelty cases in Maricopa County.


GLENDALE POLICE DEPARTMENT
6835 N. 57th Drive, Glendale, AZ 85301, (623) 930-3000
**Reserve Police Officer**, 1995-2003
* Duties included five years as a patrol officer responsible for the enforcement of laws, maintenance of order, and protection of lives and property in an assigned area of the community. Including, but not limited to, patrolling; investigating a variety of calls and complaints; making arrests and/or issuing citations; and testifying in court. Three years spent as part of the GPD K-9 squad; also working with K-9 units of Maricopa County S.O., Goodyear P.D. and Avondale P.D.—provided on-site medical assistance for the animals; assisted in training by decoying and assisting in tracking drills; and responded to K-9 police calls for service.

MCSO_003387

NANCY C. BRADLEY-SIEMENS, DVM, MNM
5715 W. Utopia Rd, Glendale, AZ, 85308, nbradl@midwestern.edu

## TEACHING EXPERIENCE

* Adjunct Clinical Assistant Professor at Midwestern University College of Veterinary Medicine 2014-2015.

* Over sixteen years' experience teaching including: K-9 first aid for the Maricopa County Sheriff's Office (M.C.S.O.) K-9 Academy; instructing M.C.S.O. Cruelty Investigators in animal restraint techniques; teaching the Phoenix Fire Department Search and Rescue K-9 Unit Paramedics advanced K-9 first aid. Coordinated and implemented an externship program in emergency medicine for fourth year vet students while at the Emergency Animal Clinic and the externship at the AHS. Participated in the curriculum rewrite and taught AHS's EAMT course; 50 hour course veterinary field technician training, as well as teaching multiple veterinary technician courses. Lectured at conferences, shelter medicine and animal cruelty issues. Currently, working with Midwestern University faculty designing veterinary forensic pathology electives for new veterinary school.

## HONORS AND AWARDS

 * Lifesaving Award, Glendale Police Department

4

MCSO_003388

# Exhibit B

MCSO_003389

**Expert Report of Nancy Bradley DVM, MNM**

**Exhibit B**

**<u>List of Prior Testimony</u>**

Maricopa County Superior Court, CR 2014-110986-001 October 2014

Gilbert Municipal Court, Case No. 2015CT3620

Maricopa County Superior Court, Phoenix Police Dept. No. DR 2012-00822336

Gilbert City Court, Gilbert Police Dept. No. DR 13-13707

Scottsdale City Court, Case No. SC 2010-021072

North Mesa Justice Court, Case No. JC2015-143315

Maricopa County Superior Court, Case No. CR2015-001839-001

Gilbert City Court, Case No. 2013CT10318

Municipal Court of Phoenix, Complaint No. 2014-9022605

MCSO_003390

Exhibit C

MCSO_003391

**Expert Report of Nancy Bradley DVM, MNM**
**Exhibit C**

**Materials Considered**

1. Maricopa County Sheriff's Office Investigative Report (MCSO_001270 – MCSO_003333).

2. Deposition of Austin Lane Flake (July 26, 2016).

3. USDA, "Minimum Space Requirements for Dogs" (attached as Exhibit D).

4. Ohio Department of Agriculture, "ODA Minimum Space Requirements for Dogs" (attached as Exhibit E).

# Exhibit D

MCSO_003393

# Minimum Space Requirements for Dogs

The Animal Welfare Act Regulations require that primary enclosures for adult dogs without nursing puppies or weaned puppies must have adequate space to allow the dogs to turn about freely, to stand, sit and lie in a comfortable, normal position and to walk in a normal manner. 9 CFR 3.6(a)(2)(xi) Additionally, the interior height of the primary enclosure must be at least 6 inches higher than the head of the tallest dog in the enclosure, measured when the dog is standing in a normal comfortable standing position. 9 CFR 3.6(c)(1)(iii)

**Measuring the Length of a Dog**

With the dog in a normal standing position, or with the dog held lying flat on its side, measure the dog along a straight line from the tip of the nose to the base of the tail. Do not follow the contours of the dog's body when measuring the length of the dog.

There must be a minimum space of 6 inches from the top of dog's head to the top of cage



This table below provides a guide to the minimum space needed for dogs based on body length

| Dog Length (in) | Sq Ft Needed | Dog Length (in) | Sq Ft Needed | Dog Length (in) | Sq Ft Needed |
|---|---|---|---|---|---|
| 7 | 1.17 | 19 | 4.34 | 31 | 9.51 |
| 8 | 1.36 | 20 | 4.69 | 32 | 10.03 |
| 9 | 1.56 | 21 | 5.06 | 33 | 10.56 |
| 10 | 1.78 | 22 | 5.44 | 34 | 11.11 |
| 11 | 2.01 | 23 | 5.84 | 36 | 12.25 |
| 12 | 2.25 | 24 | 6.25 | 38 | 13.44 |
| 13 | 2.51 | 25 | 6.67 | 40 | 14.69 |
| 14 | 2.78 | 26 | 7.11 | 42 | 16.00 |
| 15 | 3.06 | 27 | 7.56 | 44 | 17.36 |
| 16 | 3.36 | 28 | 8.03 | 46 | 18.78 |
| 17 | 3.67 | 29 | 8.51 | 48 | 20.25 |
| 18 | 4.00 | 30 | 9.00 | | |

## Calculating Minimum Space Requirements 9 CFR 3.6(c)(1)(i)

The following is an example of how to calculate minimum space requirements.
Scout is a female Dalmatian. She is 31 inches long from the tip of her nose to the base of the tail.

**Step 1: Measure the length of the dog from tip of nose to base of tail (inches). Add 6 inches to this number.**

31 inches + 6 inches  =  37 inches

**Step 2: Calculate minimum floor space in square inches.**

37 inches x  37 inches  =  1369 square inches   minimum required amount of floor space in square inches

**Step 3: Calculate minimum floor space in square feet.**

$$\frac{1369 \text{ square inches}}{144} = 9.51 \text{ square feet}$$   minimum floor space in square feet

** The total floor space for animals in group housing must meet or exceed each dog's individual minimum space requirement.

MCSO_003394

## Special Requirements for Dams with Nursing Puppies

The additional space required for dams with nursing puppies is determined by the dog's breed and behavioral characteristics, the veterinarian's approval and the minimum space requirement calculation. 9 CFR 3.6(c)(1)(ii) Each puppy requires a minimum of 5% of the dam's minimum space requirement.

Example: Scout has a litter of 9 puppies. Scout is 31" from the tip of her nose to the base of her tail. Calculate the minimum amount of space they require.

**Step 1: Calculate dam's minimum space requirement in square inches.**

(31 inches + 6) x (31 inches + 6)  =    **1369 inches**

**Step 2: Calculate additional minimum floor space per puppy.**

1369 square inches x 0.05  =    **68.45 sqaure inches**   Scout's puppies each need 68.45 square inches of space

**Step 3: Multiply additional floor space per puppy by number of puppies.**

68.45 square inches x 9 puppies  =    **616.05 square inches**   minimum amount of additional floor space for all 9 puppies

**Step 4: Calculate minimum space requirement in square inches. Add Scout's space requirements to the space requirement for the puppies**

1369 square inches + 616.05 square inches  =    **1985.05 square inches**   total minimum space requirement in square inches: Scout and her puppies need 1985.05 square inches of space

**Step 5: Calculate space required in square feet.**

$$\frac{1985.05 \text{ square inches}}{144} = \text{13.79 square feet}$$   total minimum space in square feet: Scout and her puppies need 13.79 square feet of space

If the available floor space does not meet the minimum amount calculated, then the housing must be approved by the APHIS administrator. 9 CFR 3.6(c)(1)(ii)

## Note: The Exercise Requirement for dogs (9CFR 3.8) includes some floor space requirements.

If the enclosure meets the floor space requirements for group housed dogs, the enclosure is in compliance with the exercise requirement of Section 3.8
Singly housed dogs must be provided with twice the floor space required by Section 3.6 (c)(1), unless other opportunities for exercise are planned and documented in a written exercise plan as described in Section 3.8.
Exercise requirements do not apply to dams with nursing puppies or to dogs under 12 weeks of age.

  

Exhibit E

MCSO_003396



**Ohio** | **Department of Agriculture**
Governor John R. Kasich • Lt. Governor Mary Taylor
Director David T. Daniels

Division of Animal Health
Commercial Dog Breeders Office
8995 East Main Street, Reynoldsburg, OH 43068
Phone: 614-728-6220 • Fax: 614-752-3065
www.agri.ohio.gov • dwa.cdb@agri.ohio.gov

# ODA Minimum Space Requirements for Dogs

Commercial Dog Breeders rules require that primary enclosures for adult dogs without nursing puppies or weaned puppies must have adequate space to allow the dogs to turn about freely, to stand, sit, and lie in a comfortable, normal position and to walk in a normal manner (OAC 901:1-6-02 D-2).   Additionally, the interior height of the primary enclosure must be at least six (6) inches higher than the head of the tallest dog in the enclosure, measured when the dog is standing in a normal comfortable standing position (OAC 901:1-6-02 D-4).

**Note: OAC 901:1-6-01 E Existing Facility      OAC 901:1-6-02 G Existing Facilities Primary Enclosures**

Measuring the Length of a Dog

With the dog in a normal standing position, or with the dog held lying flat on its side, measure the dog along a straight line from the tip of the nose to the base of the tail.  Do not follow the contours of the dog's body when measuring the length of the dog.

There must be a minimum space of 6 inches from the top of dog's head to the top of cage



| Dog Length (in) | Sq Ft Needed | Dog Length (in) | Sq Ft Needed | Dog Length (in) | Sq Ft Needed |
|---|---|---|---|---|---|
| 7 | 2.35 | 17 | 7.30 | 27 | 15.12 |
| 8 | 2.72 | 18 | 8.00 | 28 | 16.06 |
| 9 | 3.13 | 19 | 8.86 | 29 | 17.02 |
| 10 | 3.56 | 20 | 9.76 | 30 | 18.00 |
| 11 | 4.10 | 21 | 10.12 | 31 | 19.02 |
| 12 | 4.50 | 22 | 10.88 | 32 | 20.06 |
| 13 | 5.00 | 23 | 11.68 | 33 | 21.12 |
| 14 | 5.50 | 24 | 12.50 | 34 | 22.22 |
| 15 | 6.10 | 25 | 13.35 | 36 | 24.50 |
| 16 | 6.70 | 26 | 14.22 | 38 | 26.88 |

## Calculating Minimum Space Requirements For First/Largest Dog OAC 901:1-6-02

The following is an example of how to calculate minimum space requirements.
Jess is a female Cocker Spaniel.  She is 24 inches long from the tip of her nose to the base of the tail.

**Step 1:  Measure the length of the dog from tip of nose to base of tail (inches).  Add 6 inches to this number.**

**24 inches + 6 inches =  30 Inches**

**Step 2:  Calculate minimum floor space in square inches.**

**30 inches X 30 inches =  900 square inches**

**Step 3: Now we are going to double this number to get the space we need.**

MCSO_003397



**Ohio** | **Department of Agriculture**
Governor John R. Kasich • Lt. Governor Mary Taylor
Director David T. Daniels

**Division of Animal Health**
**Commercial Dog Breeders Office**
8995 East Main Street, Reynoldsburg, OH 43068
Phone: 614-728-6220 • Fax: 614-752-3065
www.agri.ohio.gov • dwa.cdb@agri.ohio.gov

**900 square inches X 2 = 1800 square inches** = Minimum required amount of floor space in square inches

**Step 4:  Calculate minimum floor space in square feet.**

$$\frac{1800 \text{ square inches}}{144*} = 12.5 \text{ square feet} = \text{minimum floor space in square feet}$$

**(*144= 1 square foot in inches)**

The total floor space for dogs in "<u>group housing</u>" must meet or exceed the dog's minimum space requirement.  OAC 901: 1-6-02 D1 Measure each additional dog for space requirement.

| Dog Lenth (in) | Sq Ft Needed | Dog Length (in) | Sq Ft Needed | Dog Length (in) | Sq Ft Needed |
|---|---|---|---|---|---|
| 7 | 1.17 | 17 | 3.67 | 27 | 7.56 |
| 8 | 1.36 | 18 | 4.00 | 28 | 8.03 |
| 9 | 1.56 | 19 | 4.34 | 29 | 8.51 |
| 10 | 1.78 | 20 | 4.69 | 30 | 9.00 |
| 11 | 2.01 | 21 | 5.06 | 31 | 9.51 |
| 12 | 2.25 | 22 | 5.44 | 32 | 10.03 |
| 13 | 2.51 | 23 | 5.84 | 33 | 10.56 |
| 14 | 2.78 | 24 | 6.25 | 34 | 11.11 |
| 15 | 3.06 | 25 | 6.67 | 36 | 12.25 |
| 16 | 3.36 | 26 | 7.11 | 38 | 13.44 |

# Special Requirements for Dams with Nursing Puppies

The additional space required for dams with nursing puppies is determined by the dog's breed and behavioral characteristics, the veterinarian's approval and the minimum space requirement calculation OAC 901: 1-6-02 D1. Each puppy requires a minimum of 5% of the dam's minimum space requirement OAC 901: 1-6-02 Q6.

Example: Jess has a litter of 5 puppies. Jess is 24" from the tip of her nose to the base of her tail.  Calculate the minimum amount of space they require.

**Step 1:  Calculate dam's minimum space requirement in square inches.**
**24 inches + 6 inches = 30**

**(30 inches X 30 inches) = 900 square inches**

**Step 2:  Calculate additional minimum floor space per puppy**



**Department of Agriculture**

Governor John R. Kasich • Lt. Governor Mary Taylor
Director David T. Daniels

Division of Animal Health
Commercial Dog Breeders Office
8995 East Main Street, Reynoldsburg, OH 43068
Phone: 614-728-6220 • Fax: 614-752-3065
www.agri.ohio.gov • dwa.cdb@agri.ohio.gov

900 square inches x 0.05* = 45 square inches

Jess's puppies each need 45 square inches of space.

(*0.05=5%)

**Step 3:  Multiply additional floor space per puppy by number of puppies.**

45 square inches x 5 puppies  = 225 square inches minimum amount of additional floor space for all 5 puppies

**Step 4:  Calculate minimum space requirement in square inches. Add Jess's space requirements to the space requirement for the puppies.**

900 square inches + 225 square inches  =  1125 total minimum space requirement in square inches:  Jess and her pups need 1125 square inches of space.

**Step 5:  Calculate space required in square feet**

<u>1125 square inches</u>          =          7.81 square feet minimum floor space in square feet
        144*

*144= 1 square foot in inches

**Jess and her puppies need 7.81 square feet of space.**