Stephen Montoya (#011791)
Richard J. Trujillo (#002730)
**Montoya, Lucero & Pastor, P.A.**
3200 North Central Avenue, Suite 2550
Phoenix, Arizona 85012
602-256-6718 (telephone)
602-256-6667 (fax)
stephen@montoyalawgroup.com

Attorneys for Plaintiffs

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Austin Flake and Logan Flake,<br><br>Plaintiffs,<br><br>vs.<br><br>Marie Trombi and Maricopa County,<br><br>Defendants. | No. CV 15-01132-PHX-NVW<br><br>**PLAINTIFFS' RESPONSE TO THE COURT'S ORDER OF JULY 6, 2018 AND MOTION TO AMEND THEIR COMPLAINT** |

Plaintiffs submit the following <u>Response</u> to the Court's <u>Order</u> of July 6, 2018 and also move to amend their <u>Complaint</u> to conform to the evidence under Fed. R. Civ. P. 15.

Respectfully submitted this 13th day of July 2018.

**MONTOYA, LUCERO & PASTOR, P.A.**

_____
Stephen Montoya
Richard J. Trujillo
3200 North Central Avenue, Suite 2550
Phoenix, Arizona 85012
Attorneys for Plaintiffs

# MEMORANDUM OF POINTS AND AUTHORITIES

**Argument:**

**A.  Deputy Trombi violated Austin and Logan's right to liberty under the Due Process Clause of the Fourteenth Amendment.**

"[T]here is a clearly established constitutional due process right [under the Fourteenth Amendment] not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government." Devereaux v. Abbey, 263 F. 3d 1070, 1074-1075 (9th Cir. 2001) (en banc).  The court in Devereaux based its conclusion on the Supreme Court of the United States' opinion in Pyle v. Kansas, 317 U.S. 213, 216 (1942), explaining that:

> Under Pyle v. Kansas, 317 U.S. 213, 216 (1942), the knowing use by the prosecution of perjured testimony in order to secure a criminal conviction violates the Constitution. While Pyle does not deal specifically with the bringing of criminal charges, as opposed to the securing of a conviction, we find that the wrongfulness of charging someone on the basis of deliberately fabricated evidence is sufficiently obvious, and Pyle is sufficiently analogous, that the right to be free from such charges is a constitutional right.

Devereaux, 263 F.3d at 1075.  Other circuit courts have reached similar conclusions based on similar facts.  See, e.g., Morse v. Fusto, 804 F.3d 538, 548 (2nd Cir. 2015) ("government officials may be held liable for fabricating evidence through false statements or omissions that are both material and made knowingly"), Good v. Curtis, 601 F.3d 393, 398 (5th Cir. 2010) ("a police officer's knowing efforts to secure a false identification by fabricating evidence or otherwise unlawfully influencing witnesses is not entitled to qualified immunity"), and Limone v. Condon, 372 F.3d 39, 44-45 (1st Cir. 2004) ("if any concept is fundamental to our American system of justice, it is that those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit," citing Devereaux v. Abbey).

The Ninth Circuit has established a procedural mechanism by which to establish the federal constitutional claim recognized as "clearly established" under Devereaux.

Specifically, in <u>Spencer v. Peters</u>, 857 F.3d 789, 793-794 (2017), the Ninth Circuit concluded that:

> The Fourteenth Amendment prohibits the deliberate fabrication of evidence by a state official. <u>Devereaux v. Abbey</u>, 263 F.3d 1070, 1074-75 (9th Cir. 2001) (en banc). Deliberate fabrication can be established by circumstantial evidence. For example, evidence that officials "continued their investigation of [a person] despite the fact that they knew or should have known that he was innocent," <u>id</u>. at 1076, can raise the inference that the investigator has an "unlawful motivation" to frame an innocent person. <u>Costanich v. Dep't of Soc. & Health Servs</u>., 627 F.3d 1101, 1111 (9th Cir. 2010). Or deliberate fabrication can be shown by direct evidence, for example, when "an interviewer ... deliberately mischaracterizes witness statements in her investigative report." <u>Id</u>. In cases involving direct evidence, the investigator's knowledge or reason to know of the plaintiff's innocence need not be proved. <u>Id</u>.

The Ninth Circuit further explained in <u>Spencer</u> that in order to prove a claim of "deliberate fabrication" under Section 1983, a plaintiff must establish that:

> (1) the defendant official deliberately fabricated evidence[,] and (2) the deliberate fabrication caused the plaintiff's deprivation of liberty. <u>Costanich</u>, 627 F.3d at 1111. To establish the second element of causation, the plaintiff must show that (a) the act was the cause in fact of the deprivation of liberty, meaning that the injury would not have occurred in the absence of the conduct; and (b) the act was the "proximate cause" or "legal cause" of the injury, meaning that the injury is of a type that a reasonable person would see as a likely result of the conduct in question. <u>Whitlock v. Brueggemann</u>, 682 F.3d 567, 582-83 (7th Cir. 2012).

Accordingly, based on these well-established principles, "an interviewer who deliberately mischaracterizes witness statements in her investigative report . . . commits a constitutional violation." <u>Costanich v. Dep't of Soc. & Health</u>, 627 F.3d 1101, 1111 (9th Cir. 2010).

In this case, the record is replete with evidence that Deputy Trombi's material misrepresentations and omissions about the evidence regarding the death of the dogs resulted in the indictment of Austin and Logan Flake for 21 felony counts of animal cruelty

3

without probable cause. Trombi misrepresented the evidence by falsely claiming that the air conditioning system cooling the Hughes' dog room was "on" and "working fine all night" on June 20, 2014 when the dogs died. Because the dogs died of heat stroke, Trombi's misrepresentations falsely suggested that the dog room was always extremely hot and that the Flakes had killed the dogs by putting them to "roast" in the dog room. See Exhibit 1, p. 23, lines 20-22; p. 98, line 23 to p. 99, line 8.

Specifically, Trombi falsely claimed that (1) records from the Salt River Project ("SRP") reflecting electrical consumption at the Hughes' home on June 20, 2014 showed that the air conditioning system was "on" and "was working fine all night," and (2) a report by electrical engineer George Hogge concluded that the A/C unit cooling the dog room did *not* "malfunction" and was actually "working" on the night the dogs died.

For example, in response to a specific question, Trombi falsely claimed under oath that:

> Q. So the SRP report shows that *the air was working fine all night*?
>
> A. *Yes*.

See Exhibit 1, at p. 92, lines 19-21 (emphasis added). When questioned about the SRP report again, Trombi doubled-down on her false claim by asserting that:

> Q: I'd like to clarify also. So the air was working and on until 5:30 that morning when he tried to fix it, Austin Flake tried to fix it, correct? *That's what SRP said?*
>
> A: *That's going by SRP records, yes.*
>
> Q: That it was on?
>
> A: *It was on, all night.*
>
> Q: All night?
>
> A: *All night.*
>
> Q: Thank you.

4

Id., p. 98, line 23 to p. 99, line 8 (emphasis added).

In fact, notwithstanding Trombi's assertions, the Salt River Project records did *not* show that the A/C was "on" and "working fine all night" on June 20, 2014. To the contrary, the records show that electrical usage at the Hughes' residence reached an unprecedented all time *low* during the relevant timeframe on June 20, 2014 when the dogs died. See attached Exhibit 2. Of course, this fact supports Plaintiffs' claim that the A/C unit providing fresh, cool airflow to the dog room stopped working on the night of June 20, 2014 and was the cause of the indisputably decreased energy consumption at the Hughes' residence that night. It also explains how the dogs could die of heat stroke given the uncontested fact that the Hughes had been using the room with the same A/C system to kennel dogs for approximately two years before the accident without incident.

Indeed, MCAO prosecutor Shawn Steinberg testified that she received a large, graph from the MCSO investigative team (of which Trombi was the "lead investigator") which illustrated that the electrical consumption at the Hughes' home was singularly low on the night the dogs died and later dropped to zero at approximately 6:00 a.m. when Austin said he turned the electricity off completely because he had found a sparking electrical wire in the dog room and feared an electrical fire. See attached Exhibit 3.[1]

---

[1] Based on these belatedly discovered facts, this Court vacated its summary judgment order in favor of Trombi on Plaintiffs' Section 1983 claims, explaining that:

> During the trial [of Joe Arpaio], the Court vacated the portion of its order granting summary judgment to Trombi. (Doc. 182.) Vacating that part of the order meant that the 42 U.S.C. § 1983 claim for malicious prosecution could now proceed in a separate trial. The Flakes discovered, late in the first trial, graphs prepared by the Sheriff's Office and the County Attorney's Office that, they say, suggest Trombi was aware the air conditioning failed during the night. Therefore, it was no longer true that there was no evidence Trombi misled the prosecutor or the grand jury when she swore the air conditioning was on all night. *If she did so, the malice requirement under federal law would be satisfied*.

5

To compound her misrepresentations regarding the SRP report, Trombi also misrepresented the contents of the report of MCSO's own air conditioning "expert," Mr. George Hogge, who concluded that it was "very likely" that the "indoor coil" on the air conditioning system cooling the kennel had "frozen" as a result of a "plugged filter" rendering the system "completely ineffective." See Exhibit 4, p. 3 (#000656).

However, when asked by the prosecutor whether or not Mr. Hogge's report concluded that the air conditioning was "working," Detective Trombi failed to reveal that Mr. Hogge had also concluded that the A/C unit had in fact "very likely" "froze" due to a "plugged filter." See Exhibit 4, p. 3 (#000656). Instead of accurately representing the evidence, Trombi falsely claimed that Mr. Hogge's report showed that the air conditioning unit cooling the kennel had *not* "malfunction[ed]" and "was working" on the night the dogs died. Exhibit 1, p. 89, line 9 to p. 91, line 25.

Specifically, Trombi claimed as follows:

> Q. Did the sheriff's office hire an engineer George, Hogge, H-o-g-g-e, to do an HVAC report?
>
> A. Yes.
>
> Q. Tell us what the HVAC people said.
>
> A. So the HVAC people did a complete systems check, all electrical on the house, the system check on the air

---

See Order of May 31, 2018, Doc. 279, p. 5, line 24 to p. 6, line 6 (emphasis added). The Court's ruling in this regard reflects the controlling Ninth Circuit case law governing both "deliberate fabrication" *and* "malicious prosecution" claims. See, e.g., Devereaux, 263 F.3d 1074-1075, Spencer, 857 F.3d at 793-794, and Costanich, 627 F.3d at 111, as to "deliberate fabrications" claims, and Blakenhorn v. City of Orange, 485 F.3d 463, 482 (9th Cir. 2007) ("A police officer who maliciously or recklessly makes false reports to the prosecutor may be held liable [for malicious prosecution] for damages incurred as a proximate result of those results"), and Galbraith v. County of Santa Clara, 307 F.3d 1119, 1126 (9th Cir. 2002) ("coroner's reckless or intentional falsification of an autopsy report that plays a material role in the false arrest and prosecution of an individual can support a claim under 42 U.S.C. §1983 [for false arrest and malicious prosecution]"), as to malicious prosecution claims.

6

MONTOYA, LUCERO & PASTOR
A PROFESSIONAL ASSOCIATION OF LAWYERS
3200 NORTH CENTRAL AVENUE, SUITE 2550
PHOENIX, ARIZONA 85012

> conditioning. . . They found *no malfunction* with the air conditioning during all their testing.
>
> Q. So there was air conditioning that went into this room?
>
> A. There was one vent in that room.
>
> Q. And did the HVAC report indicate that they thought it was inadequate for that room?
>
> A. They thought that the room size and the ventilation, the system itself was inadequate for what the room was used for.
>
> Q. But it was working?
>
> A. *It was working*.

Exhibit 1, p. 89, lines 9-11, p. 90, lines 20-23, p. 91, lines 1-13 (emphasis added). Of course, an A/C unit that is "working" without "malfunction" is also not simultaneously "completely ineffective" due to a "plugged filter."

Accordingly, Trombi consistently, falsely claimed that the air conditioning system in the kennel was "on" and "working fine all night," when in fact the air conditioning system cooling the kennel unexpectedly failed and caused the dogs to overheat and die, making the incident a "tragic accident" that the official spokesperson of the MCSO admitted in the first place, rather than something "intentionally" or "knowingly" felonious under A.R.S. §13-2910(A)(8).

This conclusion is confirmed by MCSO's other "expert" witness, veterinarian Bernard Mangone, DVM, who concluded that the dogs died of heat stroke ("hypothermia") as a result of *negligence—not* because anyone intended to harm the pets, "In my opinion, the deaths [of the dogs] were the direct result of the *negligent* actions of the owners of Green Acres and the caretakers that were onsite the night of the incident." See Exhibit 5, at pp. 1361 and 1362 (emphasis added).[2]

---

[2] Like Dr. Mangone, engineer George Hogge also characterized the problem as one of

Thus, neither Trombi nor the two expert witnesses (Hogge and Mangone) that the MCSO marshalled against Plaintiffs had any evidence supporting the 21 count felony indictment against Plaintiffs given the fact that felony animal cruelty charges must be based on either "intentionally" or "knowingly" subjecting animals to "cruel neglect." See A.R.S. § 13-2910(A)(8) and A.R.S. § 13-2910(H)(3). Indeed, Trombi actually admitted that Plaintiffs did *not* either intentionally or knowingly hurt the animals. See Docket No. 113, Plaintiffs' Statement of Facts, ¶¶ 85-86. Moreover, Trombi also admitted that Plaintiffs were *not* responsible for the Hughes' A/C's configuration or failure. Id. at ¶ 87. To compound her deliberate indifference to other people's rights, Trombi admitted that she was actually unaware of whether or not felony animal cruelty charges under A.R.S. §13-2910 could be predicated on either "negligence" or "recklessness." See attached Exhibit 6, p. 212, line 8 to p. 213, line 17. In short, Trombi's recommendation of felony charges against Austin and Logan was a paradigm of the reckless abuse of police power by means of misrepresentation. Trombi—a committed pet enthusiast—brazenly sought to impose her personal opinions regarding the care of animals on the Flakes regardless of the facts or the requirements of the law.

Based on these facts, it is clear that Trombi continued her investigation of Plaintiffs when she knew or should have known that they were innocent. These facts also constitute compelling "direct evidence" that Trombi deliberately misrepresented the record in order to procure baseless felony charges against Plaintiffs. Plaintiffs have consequently established federal constitutional claims under both (1) Devereaux and its progeny and (2) the Ninth Circuit's case law establishing a federal malicious prosecution claim. The "specific constitutional right" required to establish the malicious prosecution claim is "the clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government." Devereaux,

---

"neglect," "the HVAC system was *neglected* as to maintenance including the most basic requirement of changing the filter." See Exhibit 4, p. 3 (#000656) (emphasis added).

8

263 F.3d at 1074-1075 (9th Cir. 2001).[3]

If the Court concludes that Plaintiffs have not pled a <u>Devereaux</u> claim in their <u>Amended Complaint</u>, they respectfully seek leave to amend their <u>Complaint</u> to allege such a claim. The proposed amendment will not prejudice Defendants in any way because the <u>Devereaux</u> claim is substantively similar to a federal malicious prosecution claim and based on the same facts. <u>See</u>, <u>e.g.</u>, <u>Bradford v. Scherschligt</u>, 803 F.3d 382, 388 (9th Cir. 2015) ("the right at issue in a <u>Devereaux</u> claim is the right to 'be free from criminal charges' based on a claim of deliberately fabricated evidence . . . . In this regard, it is similar to the tort of malicious prosecution, which involves the right to be free from the use of legal process that is motivated by malice and unsupported by probable cause"). <u>See also</u> <u>Blakenhorn v. City of Orange</u>, 485 F.3d 463, 482 (9th Cir. 2007) ("A police officer who maliciously or recklessly makes false reports to the prosecutor may be held liable [for malicious prosecution] for damages incurred as a proximate result of those results"), and <u>Galbraith v. County of Santa Clara</u>, 307 F.3d 1119, 1126 (9th Cir. 2002) ("coroner's reckless or intentional falsification of an autopsy report that plays a material role in the false arrest and prosecution of an individual can support a claim under 42 U.S.C. §1983 [for malicious prosecution]"). Thus, based on the particular facts of this case, a <u>Devereaux</u> claim and a federal malicious prosecution are virtually coextensive factually and legally.

Under the circumstances, this Court should allow Plaintiffs to amend their <u>Complaint</u> to "conform to the evidence" under Fed. R. Civ. P. 15. <u>See</u>, <u>e.g.</u>, <u>Desertrain v. City of Los Angeles</u>, 754 F.3d 1147, 1154-1155 (9th Cir. 2014) ("The district court should have construed Plaintiffs' vagueness argument at summary judgment as a motion to amend

---

[3] Trombi's misrepresentations also proximately caused the violation of Plaintiffs' Fourth Amendment rights, as explained in the next section ("B") of this memorandum. Trombi's Fourth Amendment violation was "intentional" because any reasonably competent law enforcement officer would have known of the consequences of a 21 felony count indictment, much like anyone who shoots at someone knows that the bullet could kill the target.

9

their first <u>Amended Complaint</u>. And given Defendants' late disclosures and inability to make a credible claim of surprise or prejudice, the district court abused its discretion by not amending the first <u>Amended Complaint</u> to conform to the evidence and argument, and by not considering the vagueness claim on the merits"). <u>See</u> also <u>Kobold v. Good Samaritan</u>, 832 F.3d 1024, 1039 n. 4 (9th Cir. 2016), <u>Apache Survival Coal. v. United States</u>, 21 F.3d 895, 910-911 (9th Cir. 1994), <u>Johnson v. Mateer</u>, 625 F.2d 240, 242 (9th Cir. 1980), and <u>Jackson v. Hayakawa</u>, 605 F.2d 1121, 1129 (9th Cir. 1979).

**B.    Trombi's violation of Austin and Logan's Fourteenth Amendment rights deprived them of liberty and caused them injury.**

Trombi's misrepresentations and deceptive omissions "set in motion a series of acts by others" which Trombi either knew or should have known would cause others to inflict grave injury upon the Flakes. Specifically, Trombi's misrepresentations resulted in the Sheriff's Office recommending that Logan and Austin be charged with 21 felony counts of animal cruelty. Soon thereafter, as a direct result of Trombi's misrepresentations and omissions, the Maricopa County Attorney's Office accepted Trombi's recommendation and indicted Austin and Logan for 21 felony counts of animal cruelty.

Trombi's recommendation and the subsequent indictment derailed Austin and Logan's lives. For example, soon after they were indicted, they were ordered to appear to have their "mugshots" taken, which were almost immediately provided to the media and published all over the internet. <u>See</u> attached Exhibits 7, ¶¶ 4-5, and 8, ¶ 5. They were suddenly infamous. <u>Id</u>.

Austin had been attending college at Brigham Young University in Provo, Utah, but after his indictment was put on an "honor code hold" forbidding him from enrolling in any classes or otherwise participating in the BYU educational community (the alma mater of his parents) in anyway. Exhibit 7 at ¶¶ 7-10. The honor code hold resulted in the termination of the job he had held at BYU since 2011. <u>Id</u>. His reputation now in shatters, having gone from an Eagle Scout to a dog killer in the course of just a few days, he found it

difficult to find a job. Id. at ¶ 11. Austin and Logan were ultimately forced to leave their home in Provo and move back to Gilbert to live with Logan's parents. Id.

Austin soon started to suffer from anxiety and depression and was forced to seek medical treatment for the conditions. Id. at ¶¶ 17-18.

Logan also suffered immensely. See Exhibit 8. She began to experience "panic attacks"—consisting of episodic high anxiety, fear, panic and shortness of breath—that forced her to seek medical treatment. Id. at ¶¶ 16-20.

Not surprisingly under the circumstances, Austin and Logan's marriage began to fray and ultimately fail. Id. at ¶ 21. They soon divorced. Id.

Although Austin and Logan were both long time animal lovers, the conditions of their release prevented them from caring for other people's pets. Id. at ¶ 15. This made them feel like criminals, even though they had never been convicted of any wrongdoing, and there was never probable cause to indict them for purported "animal cruelty" in the first place. Id.

Because the conditions of their release also prevented them from leaving the state without permission from the government, Austin and Logan felt like prisoners in their own state and did not even think of leaving Arizona, except on one occasion and only after having asked and received the express permission of the government to do so. Exhibit 7, ¶¶ 13-16; Exhibit 8, ¶¶ 11-14. On another occasion, they were invited to visit Austin's parents in Washington, D.C., but decided not to because asking the government for "permission" to leave the state was more than they could bear. Id.

The 21 felony count indictment against Plaintiffs, when coupled with the conditions of release restricting their right to interstate travel and associate with others in reference to the care of animals, constituted a "seizure" of Plaintiffs under the Fourth Amendment as applied to the states under the Fourteenth Amendment. For example, in Karam v. City of Burbank, 352 F.3d 1188, 1193-1195 (9th Cir. 2003), the Ninth Circuit considered whether or not a travel restriction imposed as a condition for release in a misdemeanor case constituted a "seizure" under the Fourth Amendment. In concluding that the conditions of

11

release of Ms. Karam did not constitute a seizure under the Fourth Amendment, the court was careful to note that "Karam was not charged with a felony" and the restriction of her right to travel out-of-state "posed much less of a burden to her than it would to a person charged with a felony." Karam, 352 F.3d at 1194.

In contrast, in this case, Plaintiffs were charged with 21 felonies—hardly petty offenses. Moreover, Ms. Karam was not restricted in any other way. Moreover, in contrast to the facts in Karam, in this case, plaintiffs "mugshots" were taken and released to the media, and they were also prohibited from having "custody or control over another person's animal/pet." Courts considering conditions of release prohibiting interstate travel in other felony cases have concluded that the restriction constituted a "seizure." See, e.g., Albright v. Oliver, 510 U.S. 266, 278, 114 (1994) (Ginsberg, J., concurring), Evans v. Ball, 168 F.3d 856, 860-61 (5th Cir. 1999), Britton v. Maloney, 196 F.3d 24, 29-30 (1st Cir 1999), Gallo v. City of Philadelphia, 161 F.3d 217, 224-25 (3d Cir 1998), and Murphy v. Lynn, 118 F.3d 938, 942, 946 (2d Cir. 1997).

Of course, none of these injuries would have transpired but for Trombi's misrepresentations and omissions. Trombi is an experienced law enforcement officer who was well aware of the consequences of her recommendation. Because Trombi proximately caused the injuries, as the Ninth Circuit observed in McRorie v. Shimoda, 795 F.2d 780, 783 (9th Cir. 1986), she is liable for them:

> [P]ersonal participation is not the only predicate for Section 1983 liability. Anyone who "causes" any citizen to be subjected to a constitutional deprivation is also liable. The requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury.

Quoting Johnson v. Duffy, 588 F.2d 740, 743-44 (9th Cir. 1978). See also Barlow v. Ground, 943 F.2d 1132, 1136 (9th Cir. 1991). Based on this principle, Trombi is liable to Plaintiffs under Section 1983.

12

**Conclusion:**

In summary, the "specific constitutional right" that Trombi intentionally violated is the right not to be subjected to criminal charges based upon fabricated evidence by a law-enforcement officer under the Due Process Clause of the Fourteenth Amendment. This violation in turn proximately caused the violation of Plaintiffs' Fourth Amendment rights by depriving them their constitutional right to interstate travel and their right to care for the animals of third parties. And of course, Trombi's unlawful misrepresentations and omissions proximately caused Plaintiffs severe emotional distress.

These facts give rise to claims for (1) the deliberate fabrication of evidence, and (2) malicious prosecution—both of which arise under the Due Process clause of the Fourteenth Amendment.

Respectfully submitted this 13th day of July 2018.

**MONTOYA, LUCERO & PASTOR, P.A.**

_____
Stephen Montoya
Richard J. Trujillo
3200 North Central Avenue, Suite 2550
Phoenix, Arizona 85012
Attorneys for Plaintiffs

13

I hereby certify that on July 13, 2018, I electronically transmitted the foregoing document to the Clerk of Court using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following registrants:

Jeffrey S. Leonard
Evan F. Hiller
Sacks Tierney, P.A.
4250 North Drinkwater Blvd., 4th Floor
Scottsdale, Arizona 85251
Attorneys for Defendants

Stephen M. Dichter
J.P. Harrington Bisceglia
Christian Dichter & Sluga, P.C.
2700 North Central Avenue, Suite 1200
Phoenix, Arizona 85004
Counsel for Defendant Marie Trombi

/s/ Stephen Montoya
_____